Finally, any concern that we might create a "bad precedent" — a dubious consideration in any case, as each must be decided on its own facts — is particularly unwarranted in a habeas action, where our decision to uphold a state court ruling says nothing about its correctness, but means only that it is not "unreasonable" in light of the governing Supreme Court precedents. The state court ruling before us, in my judgment, easily satisfies this standard..

### IV. *CONCLUSION*

All conceivable aspects of the Sixth Amendment right of confrontation were afforded to Petitioner Willie Brumley in this case: his accuser, Tony Kirklin, testified under oath, in a courtroom with the trial judge presiding, and while standing face-to-face with the accused; Brumley took full advantage of his opportunity to cross-examine this witness; and the jury was able to witness Kirklin's demeanor as he testified. All are agreed that the process employed by the trial court did not in any way diminish the reliability of the resulting testimonial evidence introduced at trial, and there is no indication that live testimony would have been any better, or even different, in this respect. Yet, despite all this, the majority finds that Brumley's constitutional guarantee of confrontation was abridged, and that the Ohio courts acted both contrary to Supreme Court precedent and unreasonably in ruling otherwise. I disagree on all scores, and respectfully dissent.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0365P (6th Cir.)
File Name: 01a0365p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

WILLIE BRUMLEY,
    *Petitioner-Appellee,*

    *v.*

CURTIS WINGARD,
    *Respondent-Appellant.*

No. 00-3515

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 97-02706—Dan A. Polster, District Judge.

Argued: August 7, 2001

Decided and Filed: October 11, 2001

Before: MOORE and COLE, Circuit Judges; ROSEN,
District Judge.[*]

———————

### COUNSEL

**ARGUED:** Stuart W. Harris, OFFICE OF THE ATTORNEY GENERAL, CORRECTIONS LITIGATION SECTION, Columbus, Ohio, for Appellant. John Fenlon,

———————

[*] The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

PUBLIC DEFENDER'S OFFICE, OHIO PUBLIC DEFENDER COMMISSION, Columbus, Ohio, for Appellee. **ON BRIEF:** Mark Joseph Zemba, OFFICE OF THE ATTORNEY GENERAL OF OHIO, CORRECTIONS LITIGATION SECTION, Cleveland, Ohio, for Appellant. John Fenlon, PUBLIC DEFENDER'S OFFICE, OHIO PUBLIC DEFENDER COMMISSION, Columbus, Ohio, for Appellee.

MOORE, J., delivered the opinion of the court, in which COLE, J., joined. ROSEN, D. J. (pp. 28-72), delivered a separate dissenting opinion.

---

### OPINION

---

KAREN NELSON MOORE, Circuit Judge. In this habeas case, Warden Curtis Wingard (hereinafter "the State") appeals an order denying post-judgment relief from the district court's order granting habeas petitioner Willie Brumley relief and directing the State to retry Brumley for complicity to commit aggravated murder. We **AFFIRM** the district court's denial of the State's post-judgment motion. We hold that the district court did not abuse its discretion in denying the State's motion for post-judgment relief because the district court had already considered and rejected the arguments raised in it. In addition, we hold that the district court did not err in granting Brumley habeas relief, because the state trial court's admission of videotaped deposition testimony, without a showing of the witness's unavailability, was contrary to and/or an unreasonable application of clearly established Supreme Court precedent.

### I. BACKGROUND

In 1989, Willie Brumley was convicted by a Portage County, Ohio, jury of complicity to commit aggravated murder with two death penalty specifications and kidnaping in connection with the 1984 abduction and murder of Becky

discussed earlier, I firmly believe, upon reviewing the relevant Supreme Court precedents, that the unchallenged reliability of Kirklin's videotaped testimony in this case should mitigate, in whole or at least in part, the State's duty to make good-faith efforts to achieve what would essentially be a useless object: namely, the production of Kirklin at trial, where he would simply repeat his videotaped testimony of a few weeks earlier.

Finally, I feel I must respond to the majority's "slippery slope" contention — a scarecrow often used to shore up an untenable legal position — that the denial of habeas relief to Brumley in this case "would in effect permit trial by deposition, the evil that the framers of the Confrontation Clause sought to prohibit." (Majority Op. at 21.) This concern is misplaced in a number of respects. First, as I have endeavored to show in my survey of the history and purpose of the Confrontation Clause, this case — like *Craig*, only more so, given the actual face-to-face confrontation here between accused and accuser — involves a procedure that is "a far cry from the undisputed prohibition of the Confrontation Clause: trial by *ex parte* affidavit or inquisition." *Craig*, 497 U.S. at 851, 110 S. Ct. at 3166.

Next, the ruling I advocate here would in no way reward the "lazy" prosecutor who, as in *Barber*, makes no effort to achieve the confrontation required under the Sixth Amendment. Rather, the result I propose necessarily would be limited to the facts presented, where (i) the State actually procured the accuser's presence before the accused and afford a full and fair opportunity for cross-examination; (ii) this confrontation was videotaped for viewing by the jury; and (iii) there has been no showing of any material developments between the time of the accuser's testimony and the time of trial.

---

"reasonable" or "unreasonable" application of the law as announced by the Supreme Court.

and its resolution presents a mixed question of law and fact. This Circuit very recently confirmed that, "[i]n a habeas case, we apply the 'unreasonable application' prong of § 2254(d)(1) to a mixed question of law and fact." *Mitchell v. Mason*, 257 F.3d 554, 561 (6th Cir. 2001). This reflects our recognition that a state-court's resolution of a fact-laden issue can rarely be "contrary to" Supreme Court precedent, and only when the state court confronts a set of facts that are "materially indistinguishable" from the facts underlying a Supreme Court ruling. *See Williams*, 120 S. Ct. at 1519-20. The District Court realized, and Brumley's own counsel conceded at oral argument, that this is not the case here.

I also believe that the majority errs in its strict compartmentalization of the "unavailability" and "reliability" prongs of the two-part test set forth in *Roberts*. The majority suggests that it is improper even to consider the reliability of Kirklin's videotaped testimony until it is first established that this witness was constitutionally "unavailable" at Brumley's trial. *Roberts* itself, however, seems to refute this proposition, as the Court (i) expressly recognized that there are circumstances in which "the utility of trial confrontation [is] so remote" that the witness's availability need not be determined, 448 U.S. at 65 n.7, 100 S. Ct. at 2538 n.7, and (ii) proceeded, in its analysis of the facts before it, to *first* address the issue of reliability *before* turning to the question of unavailability, *see* 448 U.S. at 67-68, 100 S. Ct. at 2540. Other courts, accordingly, have recognized that "[t]he question of reasonable means [to secure a witness's presence at trial] cannot be divorced from the significance of the witness to the proceeding at hand, the reliability of the former testimony, and whether there is reason to believe that the opposing party's prior cross exam was inadequate." *United States v. Johnson*, 108 F.3d 919, 922 (8th Cir. 1997).[14]   As

---

[14] I recognize that the disposition of Brumley's habeas petition is to be determined only by reference to Supreme Court precedents, and not the decisions of the lower courts. *See* 28 U.S.C. § 2254(d)(1); *see also Williams*, 120 S. Ct. at 1523. Yet, a federal appellate court ruling is at least probative on the question whether a state court's similar ruling is a

Knapp. Brumley was sentenced to life in prison with parole eligibility in thirty years on the complicity to commit aggravated murder count and to a maximum of twenty-five years on the kidnaping count; the sentences were to run consecutively.

After exhausting his state appeals, Brumley filed a federal application for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, on October 21, 1997. The habeas petition was transferred to Magistrate Judge Vecchiarelli for a report and recommendation. Brumley raised only one ground for relief in his federal habeas petition, a Confrontation Clause claim. This claim was described in the following way in his habeas petition: "Trial court permitted State to enter videotape deposition of Tony Kirklin, at the time incarcerated in an Arizona state correctional facility, in lieu of live-in-court testimony. Trial court found Kirklin 'unavailable' and thus testimony admissible." Joint Appendix ("J.A.") at 11.

Tony Kirklin ("Tony") was the brother of Delmar Kirklin ("Delmar"), the individual charged with the murder of Knapp. Tony was a passenger in the car Delmar was driving on the day of the murder, as were Brumley, Kevin Davis ("Davis") (a half-brother of the Kirklins), and Marty Marshall. Tony witnessed the events leading up to the shooting of Knapp by Delmar, including the shooting itself. At the time the State was preparing to try Delmar and Brumley separately in 1989, Tony was incarcerated in an Arizona state prison, having been convicted of cocaine possession in the intervening years. The State thus provided for Tony to be transported from Arizona to Ohio to testify against his brother, Delmar. Delmar's trial had been scheduled before Brumley's, but Delmar pleaded guilty shortly before his trial.

The prosecution then moved the trial court, pursuant to Ohio Crim. R. 15[1] and Ohio Rev. Code § 2945.50,[2] to allow them to depose Tony, on videotape, with Brumley and his counsel present. The prosecution offered three reasons for videotaping Tony's testimony at that time. First, the prosecution pointed to the difficulty of the procedures involved, which would require another Arizona state court order before Tony could be transported a second time. Second, the prosecution pointed to the expense of transporting Tony a second time. Third, the prosecution raised the concern that Tony could be released on parole before the trial of Brumley took place, and thus that Tony would be beyond the subpoena power of the State when his testimony would be needed. The state trial court granted this motion over the vigorous objections of Brumley's defense counsel. The prosecution deposed Tony, on videotape, on April 28, 1989.[3]

Tony testified that he had been a passenger in Delmar's Grand Prix when Delmar picked up Becky Knapp, who was hitchhiking at the time. Delmar eventually drove the Grand

---

[1] Ohio Crim. R. 15(A) states that a deposition may be taken "[i]f it appears probable that a prospective witness will be unable to attend or will be prevented from attending a trial or hearing, and if it further appears that his testimony is material and that it is necessary to take his deposition . . . to prevent a failure of justice." Ohio Crim. R. 15(F) specifies when a deposition may be used at trial: "At the trial . . . a part or all of a deposition, so far as otherwise admissible under the rules of evidence, may be used if it appears . . . that the witness is out of the state . . . ."

[2] Ohio Rev. Code § 2945.50 states in relevant part: "At any time after an issue of fact is joined upon an indictment, . . . the prosecution or the defendant may apply in writing to the court . . . for a commission to take the depositions of any witness."

[3] The dissent suggests that we "obscure" "the trial-like setting" in which the deposition was taken by "consistently refer[ring] to Tony Kirklin's 'deposition testimony'" (Dissent, *post* at 29). The term "deposition testimony" is accurate, however, as this is the language used by the Ohio Revised Code and the Ohio Rules cited *supra*.

transportation of a prisoner is an inherently risky endeavor. Thus, I believe that the State's success in bringing Kirklin from Arizona to Ohio, and its subsequent steps to ensure that Brumley had the opportunity to confront this witness against him and that this confrontation would be preserved on videotape, should count *toward*, and not *against*, the prosecution's duty to make a good-faith effort to secure a witness's presence at trial. Indeed, this effort would have succeeded, if not for the fact that, through no fault of the State, the witness was ordered returned to Arizona.

In light of these circumstances, I fail to see how the trial court could be deemed to have acted unreasonably in ruling that Kirklin was constitutionally "unavailable" at trial. *Barber v. Page*, *supra,* a case the majority finds "very similar" to this one, (Majority Op. at 14), in fact rested upon a finding that "the State made absolutely no effort to obtain the presence of [the accusing witness] at trial other than to ascertain that he was in a federal prison outside Oklahoma," the place of trial. *Barber*, 390 U.S. at 723, 88 S. Ct. at 1321. As a result, the defendant in *Barber never* cross-examined this witness. As discussed, the State of Ohio did a good deal more in this case, thereby *ensuring* Brumley's right of confrontation. The Supreme Court's other "unavailability" cases are equally distinguishable, as they involve witnesses who had died, *Mattox*, 156 U.S. at 240, 15 S. Ct. at 338, one who was out of the country, so that the State was "powerless to compel his attendance" at trial, *Mancusi*, 408 U.S. at 212, 92 S. Ct. at 2313, and a witness whose location was unknown, even to her parents, *Roberts*, 448 U.S. at 75, 100 S. Ct. at 2544. Given these precedents, lying at two ends of a broad spectrum of "availability," I find no "clearly established" law that squarely governs the far different set of circumstances in this case, such that the Ohio courts reasonably could have reached only one conclusion.

Still less can I fathom how the trial court's ruling on this question of unavailability could be deemed "contrary to . . . clearly established Federal law," as the majority concludes. This issue, as noted earlier, turns on a fact-intensive inquiry,

State did not simply sacrifice Brumley's right of confrontation to its own "administrative convenience and budgetary concerns." (Majority Op. at 19.) To the contrary, it was only through the State's use of its administrative processes, budget, and personnel that Brumley *had* the opportunity to confront and cross-examine his accuser. Then, through no fault of the State, this witness was returned to Arizona before Brumley's trial had commenced. What Brumley sought, and what the State resisted as wasteful of limited resources, was a *second* opportunity to confront this witness, despite the absence of any showing that the first opportunity was constitutionally deficient, or that the second confrontation would differ in any way from the first. Under these circumstances, the State's interest, while perhaps not comparable to the interest advanced in *Craig*, was sufficient to offset any minimal impact upon Brumley's right of confrontation.

For the same reasons, even if I were to agree that *Roberts*' limited requirement of unavailability should apply under the circumstances of this case, I would hold that this requirement was satisfied at Brumley's trial — or, at least, that the Ohio courts did not act unreasonably in so concluding. As noted, *Roberts* requires only a good-faith effort to obtain a witness's presence at trial, measured by a standard of reasonableness. *See Roberts*, 448 U.S. at 74, 100 S. Ct. at 2543. In finding that the prosecution made no effort at all in this case, the majority, in effect, penalizes the State for its successful effort to secure Kirklin's presence in Ohio for the trial of Brumley's co-defendant. After all, the majority reasons, if the State was able to bring Kirklin from Arizona to Ohio for one trial, surely it can do so again for a subsequent trial. It seems to me, however, that this analysis unduly disregards the expense, administrative burden, and other factors involved in bringing this witness to Ohio the first time. In fact, the expense was significant — particularly in light of what we were told at oral argument, that the county in which Brumley was prosecuted was small and had extremely limited resources — and the

---

constitutional text itself demands it.

Prix to the end of a dead-end road, where everyone but Brumley and Knapp exited the car. Brumley and Knapp were alone in the backseat of the Grand Prix for around twenty minutes, according to Tony; after Brumley exited, Delmar entered the Grand Prix, where he and Knapp were alone for around twenty minutes. After that interval, Delmar and Knapp exited the Grand Prix. Knapp walked to behind the car — where Brumley, Tony, and the other men were standing — and squatted down as though to urinate. At that time, Tony testified that one of the men said that Knapp had seen "too much," referring to the Grand Prix's license plates. J.A. at 87. According to Tony, Delmar said that Knapp had to die because she had seen the Grand Prix's license plates. Delmar and Brumley discussed what was going to happen to Knapp, and then the men got back into the Grand Prix. Knapp did not re-enter the vehicle.

At that time, according to Tony's deposition testimony, Brumley produced a revolver and pointed it out the window of the Grand Prix at Knapp. After holding the revolver on Knapp for a few seconds, Brumley handed the revolver to Delmar and told him to kill Knapp. According to Tony, Brumley said, "You waste her." J.A. at 90. Delmar then exited the Grand Prix, walked over to Knapp, pointed the gun at the side of her head, and fired three shots, according to Tony. Tony testified that he witnessed the first shot; he also testified that before the shooting began Davis exited the Grand Prix and started running away from the scene. Delmar and Brumley then loaded Knapp's body into the trunk of the Grand Prix. The men drove to a secluded spot, where Delmar and Brumley carried the body into the woods. (Knapp's body had not been recovered at the time of Brumley's trial, despite searches in the area Tony described; it has subsequently been recovered.) During the deposition, Brumley's counsel made objections for the record and cross-examined Tony.

At trial, the prosecution moved to present the videotaped deposition, pursuant to Ohio Crim. R. 15(F), because Tony was out of the state. In the meantime, the deposition had been "cleaned up," i.e., all the objections and rulings had been

removed. The prosecution at that time stated for the record that it had contacted the Arizona authorities the previous week, that those authorities had confirmed that Tony was still incarcerated in Arizona, and that he would remain incarcerated for the near future. The prosecution reiterated that "the State had gone to great trouble and expense to obtain" Tony's deposition testimony when he had been brought to Ohio for his brother's trial and that it was complying with the relevant Ohio statutes. J.A. at 1671. The prosecution also pointed to the defense's cross-examination of the deponent as support for the admissibility of the videotaped deposition.

The trial court granted the prosecution's motion on the basis of Ohio Crim. R. 15 and Ohio Rev. Code § 2945.50. Defense counsel objected, preserving its arguments for appeal. The trial judge overruled these defense objections. The jury then viewed the cleaned-up version of the videotaped deposition, which included the testimony summarized *supra*.

The trial testimony of two other prosecution witnesses is important to this appeal. First, another passenger in the Grand Prix, Davis, testified to what he saw the day of the murder; but because Davis exited the Grand Prix and ran away *before the shooting*, he was not an eyewitness to the events that occurred after Brumley produced the revolver. Davis did hear shots fired, however. Moreover, the prosecution also produced witness Donald Sanders, who had been in prison with both Delmar and Brumley. Sanders testified to incriminating statements Brumley made while in prison.

After his conviction, Brumley pursued his appeals in state court, filing thirty-six assignments of error with the Eleventh District Court of Appeals. He preserved his Confrontation Clause claim by raising it before that court. The state appellate court denied his appeal on this issue, holding: "Specifically, this court concludes that the state is not required to demonstrate the 'unavailability' of the witness, as

More generally, we have observed that "the 'good faith' and 'reasonableness' standards articulated in *Roberts* . . . are not subject to exact definition." *United States v. Quinn*, 901 F.2d 522, 528 (6th Cir. 1990); *see also Stoner*, 997 F.2d at 212 (noting the "case specific" finding of necessity that must be made "in order to dispense with confrontation in open court"); *Tate v. Flenoy*, 47 F.3d 1170, 1995 WL 27505, at \*3 (6th Cir. Jan. 24, 1995) ("[T]he issue of reasonableness is essentially a factual question."); *United States v. McKeeve*, 131 F.3d 1, 8 (1st Cir. 1997) (observing that "filtering constitutional concerns [under the Confrontation Clause] through a seine woven of practical necessity is a tricky business, and different situations likely will yield different accommodations"); *Christian*, 41 F.3d at 467 ("'Good faith' and 'reasonableness' are terms that demand fact-intensive, case-by-case analysis, not rigid rules.").

Thus, in a proper case, I see no impediment to judicial consideration of a State's interest in conserving its limited resources.[13] Moreover, I believe this is just such a case. The

---

379, 380 (6th Cir. 1972). In that case, the defendant requested that subpoenas be issued under Rule 17(b) "for seven witnesses, all of whom were at the time incarcerated in the Federal Penitentiary in Atlanta, Georgia." 459 F.2d at 380. We affirmed the District Court's denial of this request, stating that "[t]he Court may consider the expense to the government and more particularly the danger to the public inherent in transporting inmates over these distances." 459 F.2d at 380.

[13]A contrary conclusion — *i.e.,* that a witness must be produced live at trial if at all possible, no matter the expense or demand upon a State's resources — would not only disregard the Supreme Court's repeated references in its decisions to notions of "good faith" and "reasonableness," but could, I fear, have dire consequences in this era of increasingly world-wide criminal enterprises. Even if, for example, a process of extradition might be employed or an international treaty invoked to secure a witness's presence at a federal criminal trial, the resulting attainment of "optimal" confrontation might well be outweighed by considerations of cost, delay, and the like, particularly where the use of modern telecommunication technology might achieve all or most of the benefits of confrontation while avoiding such costs. We should not foreclose this possibility through a constitutional ruling unless the

To the contrary, the incorporation of a "reasonableness" standard into the law of confrontation invites the consideration of such factors. *Roberts* holds that the "lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness." *Roberts*, 448 U.S. at 74, 100 S. Ct. at 2543 (internal quotations and citation omitted). Similarly, the federal counterpart to the Ohio rule invoked by the trial court in this case provides, in pertinent part, that the deposition of a witness may be introduced at a criminal trial "if the witness is unavailable, as unavailability is defined in Rule 804(a) of the Federal Rules of Evidence," Fed. R. Crim. P. 15(e), and Rule 804(a), in turn, states that an out-of-court declarant is unavailable if he is "absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance . . . by process or other reasonable means," Fed. R. Evid. 804(a)(5).

Several courts have held that this "reasonableness" inquiry entails consideration of the expense involved in securing the witness's presence. *See, e.g., Christian v. Rhode*, 41 F.3d 461, 468 (9th Cir. 1994) (holding that the State of Arizona had made reasonable efforts to secure the presence of foreign witnesses at a criminal trial before offering their videotaped depositions into evidence, and "declin[ing] to demand that the state bear the significant expense of reimbursing the witnesses' travel from the Cayman Islands to Arizona"); *United States v. Johnpoll*, 739 F.2d 702, 709 (2d Cir. 1984) (holding that the Government had satisfied the "reasonableness" standard of Fed. R. Crim. P. 15, despite its "refusal to accede to the[] demands" of certain foreign witnesses that they be paid witness and subsistence fees beyond the amounts called for by statute, and that they be compensated for the time spent away from their jobs).[12]

---

[12] This Circuit also has recognized, in the analogous context of Fed. R. Crim. P. 17 and the corresponding Sixth Amendment right to compel the presence at trial of witnesses in the defendant's favor, that government expense is a relevant consideration in determining whether an indigent defendant is entitled to the issuance of a subpoena without paying the associated costs or witness fees. *See United States v. Rigdon*, 459 F.2d

that term was defined . . . in *Roberts*. Instead, in addition to showing the reliability of the deposition, the state must only show the existence of one of the circumstances set forth in Crim.R. 15(F)." J.A. at 439 (footnote omitted). Because Tony was incarcerated in Arizona at the time of Brumley's trial, the requirements of Ohio Crim. R. 15(F) had been satisfied. The state appellate court reached this conclusion based in large part on the special nature of videotaped testimony as opposed to written transcripts: "[S]ince a videotaped deposition gives the jury the opportunity to consider the witness' physical demeanor in determining his credibility, it comes the closest to approximating the circumstances under which actual live testimony is given." J.A. at 438-39. This holding, however, was limited to cases in which the videotaped deposition "was taken for *the specific purpose of using it in lieu of . . . live testimony at trial*." J.A. at 436. The Ohio Supreme Court declined to hear Brumley's appeal.

Magistrate Judge Vecchiarelli issued a report and recommendation on November 19, 1999. The magistrate judge concluded that Brumley's confrontation rights had been violated by the admission of Tony's videotaped testimony without a showing that Tony was unavailable in the constitutional sense. Specifically, the magistrate judge reasoned that "the state court disposed of the requirement of unavailability, merely stating that Supreme Court caselaw did not apply because . . . the videotape was reliable. However, the Supreme Court has never indicated, or even suggested, that a videotape, or any other medium . . . is admissible simply because it is reliable . . . ." J.A. at 3684. Moreover, the magistrate judge concluded that Tony was not unavailable in the constitutional sense. Finally, the magistrate judge concluded that the admission of the videotaped deposition was not harmless error: "Without Tony Kirklin's testimony, a reasonable jury could not convict Brumley of complicity to commit aggravated murder." J.A. at 3687. Judge Vecchiarelli thus recommended that Brumley's habeas petition be granted with respect to Brumley's conviction for complicity to commit aggravated murder, that the conviction

be vacated, and that the State be directed to retry Brumley on that charge within a reasonable time. The magistrate judge did not recommend, however, that the district court vacate Brumley's kidnaping conviction, as the record without the constitutionally inadmissible videotape adequately supported that finding.

Objections to the report and recommendation had to be filed within ten days. Brumley filed his objections, but the State failed to do so. District Judge Polster issued an order and memorandum opinion on January 19, 2000, adopting Judge Vecchiarelli's report and recommendation in full. Judgment was entered, in compliance with Fed. R. Civ. P. 58, on January 19, 2000.

On January 27, 2000, the State filed a motion for relief under Fed. R. Civ. P. 60(b)(1), claiming surprise as a result of the district court's entry of judgment. The State claimed to have never been served with a copy of the magistrate judge's report and recommendation and thus had been unaware of the need to file its objections. The State explained that when the district court substituted Warden Khelleh Konteh for Warden Curtis Wingard as respondent on the docket, counsel for the State had been mistakenly terminated as counsel of record at the same time. This substitution/termination apparently occurred on October 5, 1999.

On February 4, 2000, Judge Polster granted the State's motion to permit it to file objections to the magistrate judge's report and recommendation; in doing so, the district court treated the State's motion as a motion for reconsideration of the judgment entered on January 19, 2000. On February 11, 2000, Brumley, through counsel, objected and moved that the district court reconsider its order granting reconsideration. The State filed its objections to the magistrate judge's report and recommendation on February 17, 2000. In its memorandum, the State reiterated its position that the admission of Tony Kirklin's videotaped deposition did not violate Brumley's confrontation rights. Moreover, the State reiterated its argument that, even if the admission of the

It further seems evident to me that the outcome of this inquiry, when viewed in its proper light, is not squarely controlled by existing Supreme Court precedents, and that the Ohio court decisions in this case, therefore, are neither contrary to nor an unreasonable application of these precedents. *Craig* represents the Court's one and only application of a balancing approach to the Confrontation Clause. Although that case identifies one state interest that is sufficiently important to outweigh a defendant's right to face-to-face confrontation, *Craig* cannot fairly be read as holding that *only* this interest will suffice, and no other, or that any other proposed state interest must be at least as compelling as the one addressed in that decision, no matter how *de minimis* the abridgment of the defendant's right of confrontation. To the contrary, *Craig* provides virtually no guidance as to what other sorts of state interests might be sufficiently important to overcome one or more aspects of a defendant's right of confrontation. What little guidance there is comes from the Court's various references to prior precedents, which had used such broad language as "considerations of public policy and the necessities of the case," a "societal interest in accurate factfinding," "legitimate interests in the criminal trial process," and the "necessities of trial and the adversary process." *Craig*, 497 U.S. at 849-50, 110 S. Ct. at 3165-66.

Given this absence of clear signposts, I cannot see how the Ohio court decisions can be deemed "contrary to" or an "unreasonable application" of "clearly established Federal law," as required under the governing AEDPA standards to overturn them. If Brumley faced trial along with ten co-defendants, and not just one, we surely would agree at some point that the State need not incur the staggering expense and administrative burden of bringing the same witness from Arizona to Ohio for eleven separate trials, where videotaping technology could easily be used to ensure each jury's opportunity to view the confrontations between this witness and each co-defendant. Consequently, although the majority suggests otherwise, I do not believe that the Confrontation Clause overcomes *any* appeal to considerations of expense, administrative impediments, or manpower.

secure Tony Kirklin's presence at the trials of Willie Brumley and his co-defendant, Delmar Kirklin. In fact, the State *did* incur the considerable expense and administrative burden of obtaining Tony Kirklin's presence in Ohio for these trials, which involved locating this witness (who apparently had been jailed since prosecutors initially traveled to Arizona to meet with him), securing an order from the Arizona courts authorizing his removal from that State's prison system, and sending two deputies down to Arizona to escort Kirklin to Ohio. Presumably, having taken these steps to bring Tony Kirklin up from Arizona to testify at Delmar Kirklin's trial, the prosecution would have preferred that this witness remain incarcerated in Ohio until Brumley's trial. The trial judge, however, foreclosed this possibility, stating that the local jail's population exceeded the limit imposed by the federal court at the time, and that Kirklin had to be sent "back from whence he came." (J.A. at 50.)

Thus, the question is not, as the majority suggests, whether Brumley's right to confrontation is outweighed by the State's mere desire to "conserv[e] its resources," (Majority Op. at 20), by refusing to produce an available witness at trial. The proper inquiry, rather, is whether the State, having (i) incurred the expense of securing the presence of an out-of-state witness at a co-defendant's trial, (ii) taken steps, while this witness was in its temporary custody, to afford an opportunity for Brumley to confront this witness face-to-face and fully cross-examine him, in a trial-like setting and in the presence of the trial judge, and (iii) captured this confrontation on videotape for the benefit of the jury, nevertheless is compelled under the Confrontation Clause to incur the *additional* expense and administrative burden of bringing this out-of-state witness *back* to Ohio a few weeks later for Brumley's trial, despite the lack of any indication that this witness's live testimony at trial would differ in any respect from his trial testimony captured on videotape a short time earlier. It seems apparent to me, in short, that the "important state interest" inquiry is a good deal more complex and nuanced than might be suggested by the majority's abbreviated analysis.

videotape violated Brumley's confrontation rights, the error was harmless. Brumley responded to the State's objections, arguing that the State had not demonstrated grounds for relief under Rule 60(b)(1).

The district court issued its order on March 23, 2000, again adopting the magistrate judge's report and recommendation. The district court denied the State's motion for relief from the earlier judgment. Thus, the district court held that Brumley was entitled to a new trial on the complicity to commit murder charges but that he was not entitled to relief on the kidnaping conviction. In addition, the district court held that Brumley's motion opposing reconsideration was moot. The State filed a timely notice of appeal on April 18, 2000.

## II.  ANALYSIS

### A.  The State Is Not Limited to Appealing the District Court's Denial of Its Motion for Relief Under Rule 60(b)(1).

As a threshold matter, we must resolve whether the State is improperly arguing the merits of Brumley's habeas petition in this appeal. Brumley argues that the State is only able to appeal the district court's April 2000 order denying the State's Rule 60(b) motion for relief from judgment because the State did not file a timely notice of appeal from the district court's judgment on the merits, which was issued on January 19, 2000. Rather than filing a timely appeal of that judgment, the State moved for relief under Rule 60(b); this motion was subsequently denied.

We will treat this case as an appeal of *both* the district court's denial of the State's Rule 60(b)(1) motion and the district court's final judgment. The State did not file a notice of appeal of the district court's order granting habeas relief in January 2000. Instead, the State filed a Rule 60(b) motion for relief within ten days of the district court's final judgment; this tolled the time for the filing of an appeal. *See* Fed. R. App. P. 4(a)(4)(A)(vi). Within thirty days of the denial of that motion, the State filed a notice of appeal "from the final

judgment entered . . . on the 23rd day of March, 2000." J.A. at 3778. That judgment included both the denial of the State's Rule 60(b)(1) motion and the granting of Brumley's habeas petition on his conviction for complicity to commit aggravated murder. Thus, we read the State's notice of appeal broadly to include the district court's final judgment on the merits of Brumley's habeas petition.

**B.   The District Court Did Not Err in Granting Brumley Habeas Relief.**

**1.   The Admission of the Videotaped Deposition, Without a Finding that Tony Was Unavailable in the Constitutional Sense, Was Contrary to Clearly Established Supreme Court Precedent.**

**(a)   Standard of Review**

We review de novo the legal conclusions of the district court sitting in habeas. *Palazzolo v. Gorcyca*, 244 F.3d 512, 515 (6th Cir.), *cert. denied*, ___ S. Ct. ___, 70 U.S.L.W. 3038 (U.S. Oct. 1, 2000) (No. 00-1935). Because Brumley's habeas petition was filed after April 24, 1996, it is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Pursuant to AEDPA, habeas corpus relief is available with respect to claims adjudicated on the merits in state court only if the adjudication:

(1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. 2254(d)(1)-(2). Moreover, the findings of fact made by a state court are presumed correct and can only be contravened where the habeas petitioner can show by clear and convincing evidence that the state court's factual findings

---

forth in the Confrontation Clause — namely, the right of the accused "to be confronted with the witnesses against him" — and so dispensed with one of the "specific trial procedures that were thought to *assure* reliable evidence." *Craig*, 497 U.S. at 860-62, 110 S. Ct. at 3171-72 (Scalia, J., dissenting).[10]

It will not do, then, to summarily dismiss the State's interest here as not rising to the "compelling" level of the showing of necessity made in *Craig*. Rather, because the core constitutional guarantee of confrontation is not threatened in this case, it follows that a lesser (albeit still important) interest will suffice to tip the balance in favor of the admissibility of Tony Kirklin's videotaped testimony.[11] I believe that such an interest has been shown, and that the majority's conclusion to the contrary rests upon an improper characterization of this interest.

To read the majority's treatment of this issue, one might think that the State of Ohio made no effort whatsoever to

---

[10]In this sense, *Craig* plainly countenances a far more significant denial of a core Confrontation Clause guarantee than any minor abridgment presented here. I, like Justice Scalia, would be much more reticent to accept such a fundamental deprivation of the core constitutional right of face-to-face confrontation between accused and accuser.

[11]Perhaps nothing more succinctly captures the crux of my disagreement with the majority than its claim that *Craig* "fashioned a rule more protective of confrontation rights than that favored by the dissent." (Majority Op. at 19 n.9.) This is either a novel reading of *Craig* or a misunderstanding of my views. *Craig* sanctioned an outright *denial* of *any opportunity* for face-to-face confrontation between accused and accuser. Here, by contrast, one searches the record (and the majority opinion) in vain for any example of how Brumley's core right of confrontation was abridged in any way. It seems to me, therefore, that if an "important" state interest sufficed to uphold the procedure employed in *Craig*, an "important" state interest surely should also suffice here. My view on this point does not rest upon any "sliding scale" assessment of reliability versus governmental interest, but upon my understanding of what is embodied in the core constitutional guarantee of "confrontation."

use of the one-way closed circuit television procedure, where necessary to further an important state interest, does not impinge upon the truth-seeking or symbolic purposes of the Confrontation Clause.

*Craig*, 497 U.S. at 851-52, 110 S. Ct. at 3166-67.

In applying *Craig*'s balancing test to the facts before us, it first must be emphasized that the videotaping procedure used in this case preserved *all*, and not merely most, of the elements of the right of confrontation. In its haste to distinguish *Craig*, the majority utterly fails to acknowledge the significance of the facts (i) that Brumley confronted Kirklin face-to-face *as he testified*; (ii) that Kirklin testified under oath; (iii) that Brumley had a full opportunity to contemporaneously cross-examine Kirklin as he testified; (iv) that this confrontation took place in the courtroom and in the presence of the trial judge; and (v) that the jury was able to view (albeit by video monitor) the demeanor of Kirklin as he testified.[9] Surely, as we consider whether the State has identified a sufficiently important interest advanced by the introduction of Kirklin's videotaped testimony, we must bear in mind that *every single purpose* behind the Confrontation Clause, whether "truth-seeking" or "symbolic," was achieved through the procedure employed by the prosecution in this case. The result was testimony that unquestionably was reliable, and the majority does not contend otherwise. In contrast, the procedure approved in *Craig* abridged a "categorical guarantee of the Constitution" as expressly set

---

[9]It should be noted that nothing in *Craig* would support a distinction between the live closed-circuit procedure at issue in that case and the videotaped testimony presented to the jury in this case. To the contrary, *Craig* observes with approval that "[t]hirty-seven States . . . permit the use of videotaped testimony of sexually abused children." *Craig*, 497 U.S. at 853, 110 S. Ct. at 3167 (footnote with citations omitted); *see also Spigarolo v. Meachum*, 934 F.2d 19, 24-25 (2d Cir. 1991) (relying on *Craig* in rejecting a Confrontation Clause challenge to the introduction of the videotaped testimony of child witnesses at a criminal trial, and stating that "*Craig* did not rest on the distinction between contemporaneous and videotaped testimony").

were erroneous. 28 U.S.C. § 2254(e)(1). This presumption of correctness also applies to the factual findings of a state appellate court based on the state trial record. *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981).

The Supreme Court has recently interpreted § 2254(d)(1) to distinguish between decisions that are "contrary to" and those that are an "unreasonable application of" clearly established precedent. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court decision will be "contrary to" clearly established Supreme Court precedent where "the state court confronts a set of facts that are materially indistinguishable from a [Supreme Court] decision . . . and nevertheless arrives at a result different from [Supreme Court] precedent." *Id*. at 406. A state court decision is also "contrary to" established Supreme Court precedent where the state court "applies a rule that contradicts the governing law set forth" in those precedents. *Id*. at 405. A state court decision is an "unreasonable application of" Supreme Court precedent when the state court correctly identifies the governing legal principle but unreasonably applies it to the facts of the petitioner's case. *Id*. at 407-08. We may not overturn a state decision simply because we conclude that the state court incorrectly applied Supreme Court precedent. *Id*. at 411. Rather, to overturn a state court decision, we must determine that the its application of Supreme Court precedent was objectively unreasonable. *Id*.

In reviewing a state court decision under this standard, we look only to the Supreme Court holdings that existed at the time of the state court's decision. *Id*. at 412. We may not base our decision on Supreme Court dicta or the decisions of the courts of appeals. *See id*.; *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998).

**(b)  Analysis**

The Supreme Court has not addressed the specific fact pattern presented in this case, i.e., whether the admission of *videotaped* prior testimony without a showing of the witness's unavailability violates the confrontation rights of a criminal

defendant. Thus, in analyzing this issue the magistrate judge applied the "unreasonable application" prong of § 2254(d) because the Supreme Court had never addressed the specific facts presented by Brumley's habeas petition. JA. at 3681 (citing *Tucker v. Prelesnik*, 181 F.3d 747, 752 (6th Cir. 1999)). Given recent refinements in habeas law,[4] however, this case is appropriately analyzed under the "contrary to" prong of § 2254(d). Under *Williams*, "[a] state-court decision will certainly be contrary to . . . clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." 529 U.S. at 405. The example provided by the *Williams* Court tracks closely with the present case:

> Take, for example, our decision in *Strickland v. Washington*. If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be "diametrically different," "opposite in character or nature," and "mutually opposed" to our clearly established precedent because we held in *Strickland* that the prisoner need only demonstrate a "reasonable probability that . . . the result of the proceeding would have been different."

*Id.* at 405-06 (citations omitted) (alteration in original). As in the example provided by the *Williams* Court, the issue in the present case is ultimately the rule of law to be applied rather than the application of the correct rule to the facts. In the present case, the rule applied by state courts contradicted governing Confrontation Clause law as established in the decisions of the Supreme Court, especially the leading case of *Ohio v. Roberts*, 448 U.S. 56 (1980). The state trial court admitted the videotaped deposition without first determining

---

[4] *Williams v. Taylor*, 529 U.S. 362 (2000), was decided after the magistrate judge's report and recommendation and the district court's two decisions in the present case.

this preference occasionally must yield to "considerations of public policy and the necessities of the case." *Craig*, 497 U.S. at 849, 110 S. Ct. at 3165 (internal quotations and citations omitted). As noted earlier, the Court found that the presentation of a child witness's testimony via one-way closed circuit television, though not affording the opportunity for a face-to-face confrontation between accused and accuser, does not offend the Confrontation Clause if supported by "a proper finding of necessity." *Craig*, 497 U.S. at 857, 110 S. Ct. at 3170. In so ruling, the Court acknowledged that this procedure "prevents a child witness from seeing the defendant as he or she testifies against the defendant at trial," but nevertheless explained:

> We find it significant, however, that Maryland's procedure preserves all of the other elements of the confrontation right: The child witness must be competent to testify and must testify under oath; the defendant retains full opportunity for contemporaneous cross-examination; and the judge, jury, and defendant are able to view (albeit by video monitor) the demeanor (and body) of the witness as he or she testifies. Although we are mindful of the many subtle effects face-to-face confrontation may have on an adversary criminal proceeding, the presence of these other elements of confrontation — oath, cross-examination, and observation of the witness' demeanor — adequately ensures that the testimony is both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony. These safeguards of reliability and adversariness render the use of such a procedure a far cry from the undisputed prohibition of the Confrontation Clause: trial by *ex parte* affidavit or inquisition . . . . Indeed, to the extent the child witness' testimony may be said to be technically given out of court (though we do not so hold), these assurances of reliability and adversariness are far greater than those required for admission of hearsay testimony under the Confrontation Clause. See *Roberts*, 448 U.S., at 66, 100 S.Ct., at 2539. We are therefore confident that

*court procedures* employed in connection with this testimony, both at the time it was taken and when it was offered at trial, adequately preserved Brumley's rights under the Confrontation Clause.[8]

The majority apparently recognizes, at least implicitly, that *Craig* has some bearing upon this case. Upon doing so, however, it summarily rejects the State's proposed analogy between this case and *Craig*, reasoning that *Craig* involved the "important public interest" in "protect[ing] . . . minor victims of sex crimes from further trauma and embarrassment," (Majority Op. at 19 (quoting *Craig*, 497 U.S. at 852, 110 S. Ct. at 3167)), while the State in this case purportedly cites only "administrative convenience and budgetary concerns," (*id.* at 20-21). This conclusion, in my opinion, rests upon an improper calibration of both prongs of the balancing test employed in *Craig*.

*Craig* holds that the Sixth Amendment reflects only a *"preference* for face-to-face confrontation at trial," and that

---

[8]In fact, in a prior case involving a Confrontation Clause challenge to videotaped testimony taken for the purpose of trial, we recognized that both *Roberts* and *Craig* were relevant to our inquiry. *See Stoner v. Sowders*, 997 F.2d 209 (6th Cir. 1993). In that case, the videotaped testimony of two witnesses was taken at a police station the day before trial, and the prosecution then moved to admit this testimony at trial on the ground that the witnesses were in poor health and could not withstand "the rigors of sitting through a jury trial." 997 F.2d at 211-12. We first cited *Roberts'* requirement of unavailability, and found that the two witnesses "were in fact 'available' to testify at the trial," in the literal sense of the word, but "were 'unavailable' only in the sense that they preferred not to testify and were in poor health according to the[ir] doctor's affidavit." 997 F.2d at 212. We then turned to *Craig* to decide whether the poor health of these witnesses provided an adequate basis to deem them constitutionally "unavailable," observing that "there must be 'the requisite finding of necessity' which is 'case specific' in order to dispense with confrontation in open court." 997 F.2d at 212 (quoting *Craig*, 497 U.S. at 855, 110 S. Ct. at 3169). In short, we committed the very same "error" that the majority identifies in the Ohio appellate court ruling in this case: namely, we viewed *Craig*'s balancing approach as informing our resolution of the *Roberts* "unavailability" inquiry under the particular facts before us.

---

that the deponent was unavailable in the constitutional sense, as required by *Roberts*. The state court of appeals went even further, determining to its own satisfaction that a showing of unavailability is unnecessary because of the inherent reliability of videotaped testimony : "[T]his court concludes that the state is not required to demonstrate the 'unavailability' of the witness, as that term was defined by the United States Supreme Court in *Roberts*." J.A. at 547. In other words, the difficulty with the state courts' decisions is not with their application of *Roberts*, but rather their refusal to apply *Roberts* at all. *Cf. Williams*, 529 U.S. at 407.

In *Roberts*, the Supreme Court established a two-part "general approach," 448 U.S. at 65, to the limitations that the Confrontation Clause imposes on the admissibility of hearsay against a criminal defendant:

> First, in conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. In the usual case (including cases where prior cross-examination has occurred), the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant.
>
> The second aspect operates once a witness is shown to be unavailable. Reflecting its underlying purpose to augment accuracy in the factfinding process by ensuring the defendant an effective means to test adverse evidence, the Clause countenances only hearsay marked with such trustworthiness that there is no material departure from the reason of the general rule.

*Id.* (citations, internal quotation marks, and footnote omitted). As *Roberts* makes clear, the Confrontation Clause requires that the trial court consider the reliability of proffered hearsay evidence only after having established that the hearsay

declarant is unavailable to testify in person.[5]   Although *Roberts* suggests that there are exceptions to this general rule, *see id.* at n.7 ("A demonstration of unavailability . . . is not always required.") (citing *Dutton v. Evans*, 400 U.S. 74 (1970) (plurality opinion)), other Supreme Court precedents have clearly established that prior testimony, the type of hearsay involved in the present case, may be admitted into evidence in a manner consistent with the Confrontation Clause only upon a showing of unavailability.[6]  *See Mancusi v. Stubbs*, 408 U.S. 204, 212-13 (1972); *Mattox v. United States*, 156 U.S. 237 (1895); *see also White v. Illinois*, 502 U.S. 346, 354 (1992) ("*Roberts* stands for the proposition that unavailability analysis is a necessary part of the Confrontation Clause inquiry . . . when the challenged out-of-court statements were made in the course of a prior judicial proceeding."); *United States v. Inadi*, 475 U.S. 387, 393

---

[5]The dissent "believe[s]" that we "err[] in [our] strict compartmentalization of the 'unavailability' and 'reliability' prongs of the two-part test set forth in *Roberts*." (Dissent, *post* at 70.)  It is unclear to us, however, how one could read the quoted passage as not requiring a showing of unavailability before turning to the issue of reliability.  The dissent is correct in noting that the *Roberts* Court addressed "reliability" first, *see* 448 U.S. at 67-73, but it did so because the Ohio Supreme Court had based its decision on the reliability of the testimony at issue.  *See id.* at 67-68 ("We turn first to that aspect of confrontation analysis deemed dispositive by the Supreme Court of Ohio . . . whether Anita Isaacs' prior testimony . . . bore sufficient 'indicia of reliability.'").  Thus, the Supreme Court's order of presentation in *Roberts* cannot be interpreted as modifying, in any way, the clear rule established in that case, which requires that the State make a showing of unavailability regardless of the reliability of the proffered prior testimony.  If this rule embodies "a policy judgment" that live testimony is better than prior testimony, as the dissent complains (Dissent, *post* at 46), that policy judgment was made by the Supreme Court in *Roberts*.

[6]We note that the dissent agrees with our characterization of Tony Kirklin's videotaped deposition as prior testimony, conceding at least that "Tony Kirklin gave his testimony 'prior' to trial, in a purely temporal sense." (Dissent, *post* at 52.)  The dissent disagrees with us, however, in concluding that *Roberts* provides the relevant constitutional rule in the present case, despite that precedent's obvious applicability once one agrees that the deposition testimony was prior testimony.

enacting this confrontation a few weeks later during Brumley's trial.  Given *Roberts*' explicit statement of the limited nature of, and established exceptions to, its holding, I cannot see how the Ohio courts could be viewed either as having "applie[d] a rule that contradicts the governing law set forth in" *Roberts* and its progeny, or as having reached a conclusion that is not merely erroneous but unreasonable. *Williams*, 120 S. Ct. at 1519, 1522.

Indeed, as indicated earlier, I think it is open to serious question whether *Roberts* and the other Supreme Court decisions involving out-of-court statements should govern the situation presented here.  The prosecution in this case did not seek to take hearsay statements from a different proceeding or context and present them at trial.  Rather, the central dispute in this case is whether the Confrontation Clause is offended by the manner in which the prosecution took and offered the *trial testimony* of witness Tony Kirklin.  As noted, the Supreme Court has distinguished between its line of cases, including *Roberts*, which address the admissibility of out-of-court declarations, and its two decisions, in *Coy* and *Craig*, which consider "what *in-court* procedures are constitutionally required to guarantee a defendant's confrontation right once a witness is testifying." *White*, 502 U.S. at 357-58, 112 S. Ct. at 743-44.

I believe that *Craig* is at least as informative to the issue before us as *Roberts* and its progeny, and that this case lies at or near the intersection of these two lines of precedent. Plainly, if the prosecution had produced Tony Kirklin on the first day of Willie Brumley's trial, but then proposed that his trial testimony be captured on videotape and presented in this form in lieu of his live appearance before the jury, we would not analyze this situation under the Supreme Court's hearsay precedents, but would instead look first to the ruling in *Craig* under far more analogous facts.  The analysis is no different, in my view, where Kirklin did not give his trial testimony during the trial, but a few weeks beforehand.  In either event, it is *trial* testimony we are considering, and not testimony given for any other purpose, and we must ask whether the *in-*

and not by any subsequent developments.[7] In short, there is reason to be cautious and circumspect in considering whether to import evidentiary concerns into a Confrontation Clause analysis.

By mechanically applying *Roberts'* rule governing prior testimony given in a wholly different proceeding, and by construing that decision's unavailability requirement as inviolate, the majority has, in my view, fallen into just this error of elevating a rule of evidence into a constitutional command. At a minimum, my difference of opinion with the majority concerning the proper application of *Roberts* to this case, with its readily distinguishable facts, strongly indicates that the challenged decisions of the Ohio courts were neither contrary to nor an unreasonable application of the relevant Supreme Court precedents. As *Roberts* itself expressly recognizes, there are circumstances in which "[a] demonstration of unavailability . . . is not . . . required," and where "the utility of trial confrontation [is] so remote" that the prosecution need not incur the burden and expense of "produc[ing] a seemingly available witness." *Roberts*, 448 U.S. at 65 n.7, 100 S. Ct. at 2538 n.7. This is such a case, where Brumley was given a full and fair opportunity to confront and cross-examine Tony Kirklin as he gave his trial testimony, and where the jury had the opportunity to observe Kirklin's demeanor during this confrontation, so that nothing of constitutional significance would have been gained by re-

---

[7] On a practical note, if the State of Ohio responds to the grant of habeas relief by electing to retry Willie Brumley on the aggravated murder charge, we have no reason to believe, on the record before us, that Tony Kirklin will be found and made available to testify at this new trial. Kirklin's unavailability, of course, would permit the admission of his videotaped testimony at Brumley's retrial. Yet, we still would not be quite back where we were at the time of Brumley's first trial in 1989 (itself five years after the abduction and murder of Becky Knapp), because other witnesses whose testimony was *not* preserved on videotape might *also* be unavailable, or their memories faded over the twelve-year interim. Thus, there is reason to fear that our ruling might result in a state court proceeding that is far less fair, and rests upon far less reliable evidence, than the initial trial.

(1986) ("The Confrontation Clause analysis in *Roberts* focuses on those factors that come into play when the prosecution seeks to admit testimony from a prior judicial proceeding in place of live testimony at trial. In particular, the *Roberts* Court examined the requirement, found in a long line of Confrontation Clause cases involving prior testimony, that before such statements can be admitted the government must demonstrate that the declarant is unavailable.") (citation omitted); *Barber v. Page*, 390 U.S. 719, 722 (1968) ("[T]here has traditionally been an exception to the confrontation requirement where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant which was subject to cross-examination by that defendant.").

In the present case, the state trial court admitted Tony's videotaped deposition at trial after finding that the requirements of Ohio Crim. R. 15(F) and Ohio Rev. Code § 2945.50 had been satisfied. But the requirements of Ohio Crim. R. 15(F) and § 2945.50 are not identical to the constitutional requirements established in *Roberts* — most importantly, neither requires the deponent to be "unavailable" in the constitutional sense established in *Roberts* and *Barber*. At most, Rule 15(F) permits the admission of deposition testimony when the deponent is out of the state. But this does not relieve the State of its duty to make a good-faith effort to obtain the witness's presence.

The Supreme Court has held that "a witness is not 'unavailable' for purposes of . . . the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." *Barber v. Page*, 390 U.S. 719, 724-25 (1968). In fact, the *Barber* Court considered a fact pattern very similar to the present case, at least regarding the "unavailability" of the declarant. In *Barber*, the habeas petitioner was tried for armed robbery in Oklahoma; the principal evidence against the petitioner consisted of the transcribed preliminary hearing testimony of a witness, Woods, then incarcerated in a federal prison in Texas. *See id.* at 720. The prosecution offered this

preliminary hearing testimony at trial on the theory that Woods was unavailable to testify because of his incarceration, and the petitioner objected. The evidence was admitted over this objection. In seeking a federal writ of habeas corpus, the petitioner claimed that his confrontation rights had been violated by the admission of this prior testimony hearsay because the prosecution had not demonstrated the unavailability of the declarant. The district court and court of appeals denied his petition. *See id.* at 720-21.

The Supreme Court reversed, however, and established the general rule for determining whether a hearsay declarant is unavailable in the constitutional sense. In *Barber*, the prosecution "made absolutely no effort to obtain the presence of Woods at trial other than to ascertain that he was in a federal prison outside Oklahoma." *Id.* at 723. The Court acknowledged that, at one time, that showing may have demonstrated the unavailability of a potential witness. By the late 1960s, however, the "increased cooperation between the States themselves and between the States and the Federal Government" in making incarcerated witnesses available for trial had changed the Confrontation Clause analysis. *Id.* The existence of means of obtaining an incarcerated witness's presence at trial in a different jurisdiction placed an added burden on the prosecution — namely, to make a good-faith effort to employ the existing means for obtaining an incarcerated witness's presence. Where the prosecution fails to make such an effort, as they failed to do in *Barber*, the witness cannot be determined to be unavailable in the constitutional sense. "[S]o far as this record reveals, the sole reason why Woods was not present to testify in person was because the State did not attempt to seek his presence. *The right of confrontation may not be dispensed with so lightly.*" *Id.* at 725 (emphasis added).

Tony Kirklin was available to testify at Brumley's trial, at least under the rule established in *Barber*. Ohio and Arizona have both enacted the Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings, *see* Ohio Rev. Code § 2939.26; Ariz. Rev. Stat. §§ 13-4091

If one were to translate the Confrontation Clause into language in more common use today, it would read: "In all criminal prosecutions, the accused shall enjoy the right to be present and to cross-examine the witnesses against him." Nothing in this language or in its 18th-century equivalent would connote a purpose to control the scope of the rules of evidence. The language is particularly ill-chosen if what was intended was a prohibition on the use of any hearsay . . . .

*Dutton*, 400 U.S. at 95, 91 S. Ct. at 222-23 (Harlan, J., concurring in result).

Indeed, to forge an unbreakable link between the Confrontation Clause and the law of hearsay or the rules of evidence would undermine the "central concern" of this constitutional provision: namely, "to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Craig*, 497 U.S. at 845, 110 S. Ct. at 3163. The rules of evidence permit a variety of out-of-court statements — excited utterances, statements of then-existing conditions, dying declarations, and coconspirator statements during the course of a conspiracy, to name but a few — to be introduced at trial, without regard for the opportunity of the accused to confront or cross-examine the declarant. Yet, it can hardly be claimed that such statements are more reliable than Tony Kirklin's testimony in this case, which *was* subjected to rigorous testing in an adversary proceeding seen by the trier of fact. Likewise, if Tony Kirklin had died or escaped from his Arizona prison cell after giving his videotaped testimony but before Willie Brumley's trial, the videotape unquestionably would have been admissible at trial under the rules of evidence, even though nothing about Kirklin's absence would have made his testimony any more reliable than it already was; its reliability, after all, was ensured by the procedures employed *during* this testimony,

Indeed, there was no true "substitution" at all in this case; rather, the evidence offered by the prosecution at trial was used for the very purpose and in the precise way that both of the parties contemplated as they examined and cross-examined Tony Kirklin and preserved this testimony on videotape.[6]

Accordingly, I would hold that this evidence is exempt from the unavailability requirement as set forth and applied in *Roberts* and the Supreme Court's other "prior testimony" decisions. If we were deciding the matter under the law of evidence, our analysis would be governed by the express language of the relevant rules, some of which require a demonstration of witness unavailability. Yet, the Supreme Court has emphatically rejected the proposition that "the Confrontation Clause is nothing more or less than a codification of the rules of hearsay and their exceptions." *Green*, 399 U.S. at 155, 90 S. Ct. at 1933-34; *see also White*, 502 U.S. at 366, 112 S. Ct. at 748 (Thomas, J., concurring in part and concurring in judgment) (stating that "[n]either the language of the Clause nor the historical evidence appears to support the notion that the Confrontation Clause was intended to constitutionalize the hearsay rule and its exceptions," and that "the Court repeatedly has disavowed any intent to cause that result"); *Idaho v. Wright*, 497 U.S. 805, 814, 110 S. Ct. 3139, 3146 (1990) ("[W]e have . . . been careful not to equate the Confrontation Clause's prohibitions with the general rule prohibiting the admission of hearsay statements."). As observed by Justice Harlan:

---

[6]If *Roberts* makes a "policy judgment" on the question of better evidence, as the majority suggests it does, (Majority Op. at 13 n.5), it could only be that preliminary hearing testimony given over a year before trial and captured in a written transcript is not equivalent to live witness testimony at trial. This is a far cry from the policy judgment made by the majority here — that witness testimony preserved on videotape for the sole and express purpose of presentation at a soon-forthcoming trial is constitutionally "inferior" to the very same testimony, given in the very same courtroom, in front of the very same judge, and subject to the very same face-to-face confrontation and cross-examination, but differing only in that it is viewed "live" by the jury rather than on videotape.

---

to 13-4096, and thus a means existed for obtaining Tony's presence. Moreover, the prosecution had employed these procedures to obtain Tony's presence for the trial of his brother, Delmar. Thus, any state court finding that Tony was "unavailable" in a constitutional sense was contrary to clearly established Supreme Court precedent. The state trial court held that the videotaped deposition was admissible because Tony was out of the state, the requirement of Ohio Crim. R. 15(F). The actual basis of the trial court's admissibility ruling, however, is ambiguous. The trial court either made its ruling based exclusively on the fact that Tony was out of the state, under the terms of Ohio Crim. R. 15(F), or ruled in addition that Tony was unavailable in the constitutional sense, by overruling defense counsel's Sixth Amendment objection. In either case, however, the state trial court's ruling on the admissibility of the videotaped deposition was clearly contrary to the rule of *Barber*.

Perhaps recognizing this, the state appellate court determined that a showing of Tony's unavailability was unnecessary given the greater reliability of videotaped testimony. Because the jury was able to view Tony's demeanor on the videotape, the state appellate court determined that this increased reliability — over transcribed testimony — did away with the need for a showing of unavailability. Such a holding is contrary to clearly established precedent in *Barber* and *Roberts*. *Roberts* clearly requires that courts to determine that a witness is unavailable *before* determining whether the hearsay testimony is sufficiently reliable to satisfy the Confrontation Clause, despite the witness's unavailability: "The second aspect [reliability] operates *once a witness is shown to be unavailable*." *Roberts*, 448 U.S. at 65 (emphasis added). To dispense with the first part of *Roberts* without first making such a determination is contrary to clearly established Supreme Court precedent. Moreover, such a holding would completely eliminate *Barber*'s requirement that prosecutors make good-faith efforts to obtain the presence of out-of-state witnesses.

The state appellate court placed great emphasis on the fact that the videotaped deposition at issue in the present case had been prepared specifically for use at Brumley's trial as a substitute for Tony's live testimony. As a result, the videotaped deposition could address many of the concerns underlying the Confrontation Clause: the witness testified under oath; the defendant could be present and represented by counsel; defense counsel could cross-examine the witness in a manner similar to cross-examination at trial; and the judge was even to be present to rule on objections. Although these factors do support the state courts' conclusion that the videotaped deposition was reliable, they do not address the Confrontation Clause's "preference for face-to-face confrontation *at trial*." *Roberts*, 448 U.S. at 63 (emphasis added). This particular concern requires that deposition testimony be admitted only when the witness is unavailable.

Thus, the *knowing preparation* of a videotaped deposition as a substitute for the trial testimony *of a constitutionally available witness* is inconsistent with the values of the Confrontation Clause, despite reduced concerns with reliability. This view is supported by the Supreme Court's summary of the purposes of the Confrontation Clause:

> The primary object of the constitutional provision in question was to prevent depositions or ex parte affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.

*United States v. Mattox*, 156 U.S. 237, 242-43 (1895). A videotaped deponent may be cross-examined, but the criminal defendant is nonetheless subject to trial by deposition — not as a matter of *necessity*, as required by *Roberts*, but rather as

applicable as well to Confrontation Clause analysis, favor the better evidence. But if the declarant is unavailable, no "better" version of the evidence exists, and the former testimony may be admitted as a substitute for live testimony on the same point.

*Inadi*, 475 U.S. at 394-95, 106 S. Ct. at 1125-26 (citation omitted).

In short, the unavailability requirement is not a constitutional command in and of itself, but is merely a means to an end. This end, of course, is the objectives served by the Confrontation Clause. As discussed earlier, this constitutional guarantee ideally encompasses testimony given under oath while standing before the accused, a full opportunity for cross-examination, and the chance for the jury to observe the witness's demeanor. If the prosecution proposes to admit evidence that is lacking in one or more of these areas, we insist that this be done only as a matter of necessity, where no better evidence is available. In each of the Supreme Court cases involving prior testimony, the prosecution's evidence was deficient in one or more of these respects — in particular, the jury was unable to assess the demeanor of the witness on the stand while making the statements at issue, and, in some cases, the opportunity for cross-examination was diminished — and so the Court insisted upon a showing that this truly was the best available evidence.

Here, by contrast, the evidence offered by the prosecution was not "inferior," at least not in any sense encompassed by the Confrontation Clause. All of the objects of this constitutional guarantee — oath, cross-examination, opportunity to observe demeanor — were fully achieved. Brumley was afforded "all that the Sixth Amendment demands: 'substantial compliance with the purposes behind the confrontation requirement.'" *Roberts*, 448 U.S. at 69, 100 S. Ct. at 2540 (footnote and citation omitted). Thus, there was no need for the Ohio courts to insist that the prosecution produce a "better" form of evidence at trial if at all possible.

There is doubtless reason for saying that the accused should never lose the benefit of any of these safeguards even by the death of the witness; and that, if notes of his testimony are permitted to be read, he is deprived of the advantage of that personal presence of the witness before the jury which the law has designed for his protection. But general rules of law of this kind, however beneficent in their operation and valuable to the accused, must occasionally give way to considerations of public policy and the necessities of the case. To say that a criminal, after having once been convicted by the testimony of a certain witness, should go scot free simply because death has closed the mouth of that witness, would be carrying his constitutional protection to an unwarrantable extent. The law, in its wisdom, declares that the rights of the public shall not be wholly sacrificed in order that an incidental benefit may be preserved to the accused.

* * * *

The substance of the constitutional protection is preserved to the prisoner in the advantage he has once had of seeing the witness face to face, and of subjecting him to the ordeal of a cross-examination.

*Mattox*, 156 U.S. at 243-44, 15 S. Ct. at 339-40. *Inadi* makes a similar point:

There are good reasons why the unavailability rule, developed in cases involving former testimony, is not applicable to [other forms of hearsay]. Unlike some other exceptions to the hearsay rules . . . , former testimony often is only a weaker substitute for live testimony. It seldom has independent evidentiary significance of its own, but is intended to replace live testimony. If the declarant is available and the same information can be presented to the trier of fact in the form of live testimony, with full cross-examination and the opportunity to view the demeanor of the declarant, there is little justification for relying on the weaker version. When two versions of the same evidence are available, longstanding principles of the law of hearsay,

a result of the State's choice to proceed in this manner for the sake of convenience and cost-savings. The jury may be able to gauge the witness's demeanor, second-hand, on a television monitor, but the witness is not forced "to stand face to face with the jury." Thus, the state appellate court's reliance on the State's purposeful preparation of the videotaped deposition actually supports the conclusion that the state court's decision was contrary to established Supreme Court precedent.

Given the Supreme Court's refinement of habeas law in *Williams v. Taylor*, then, we are persuaded that the present case is appropriately analyzed under the "contrary to" prong of 28 U.S.C. § 2254(d). At oral argument, however, Brumley's counsel, apparently relying on the district court's analysis under the "unreasonable application" prong of § 2254(d), conceded that the state courts' decisions in this case were not contrary to established Supreme Court precedent. Because of this concession at oral argument, we are reluctant to hold simply that the state courts' decisions were contrary to clearly established Supreme Court precedent. Thus, we hold in the alternative that, analyzed under the other prong of § 2254(a), the state courts' admission of Tony Kirklin's videotaped testimony was an unreasonable application of clearly established Supreme Court precedent.[7]

As discussed *supra*, *Roberts* established a general approach for analyzing the confrontation rights of criminal defendants,

---

[7] Although the distinction drawn in *Williams* between the "contrary to" and "unreasonable application of" prongs of § 2254(d)(1) might be read to suggest that a state court decision cannot run afoul of both prongs, *Williams* clearly holds that a state court decision can indeed run afoul of both. *See Williams*, 529 U.S. at 397 ("[The Virginia Supreme Court's] analysis in this respect was thus not only 'contrary to,' but also . . . an 'unreasonable application of' the clear law as established by this Court."); *id.* at 413 (O'Connor, J., concurring) ("I believe that the Court's discussion . . . is correct and that it demonstrates . . . that the Virginia Supreme Court's decision in Williams' case, even under the interpretation of § 2254(d)(1) I have set forth . . . , was both contrary to and involved an unreasonable application of our precedent.").

and the state courts in the present case lacked a weighty enough reason for departing from this general approach. The State now seeks to distinguish the *Roberts* line of cases by analogizing the present case to *Maryland v. Craig*, 497 U.S. 836 (1990).[8]  *Craig* involved a Maryland procedure through which allegedly abused children could testify against their alleged abusers by means of closed-circuit television to avoid further emotional injury to the young witnesses. In a narrow holding, the *Craig* Court held that such a procedure for admitting audiovisual testimony does not violate the Confrontation Clause where the trial court makes "a case-specific finding of necessity" based on the emotional well-being of the child witnesses. *See id.* at 860; *see also id.* at 853 ("We . . . conclude . . . that a State's interest in the physical and psychological well-being of child abuse victims may be sufficiently important to outweigh, at least in some cases, a defendant's right to face his or her accusers in court."). *Craig* clearly contemplated that this exception to the general rule would be limited to only those cases "where denial of . . . confrontation is necessary to further an important public policy *and* . . . where the reliability of the testimony is otherwise assured." *Id.* at 850 (emphasis added).

Thus, *Craig* requires that courts consider the State's interest in avoiding confrontation separately from the reliability of the evidence at issue; a mere finding that evidence is reliable is insufficient to outweigh a defendant's confrontation rights if the denial of confrontation is not necessary to further an important public policy.[9]  In *Craig*, the important public

---

[8] We note that the state appellate court did not rely on *Craig* in dispensing with the unavailability analysis required by *Roberts*.

[9] The dissent argues that, under *Craig*, where "the core constitutional guarantee of confrontation is not threatened," "a lesser (albeit still important) interest will suffice to tip the balance in favor of . . . admissibility." (Dissent, *post* at 63.)  We are unable, however, to square this interpretation of *Craig* with the clear import of that decision — namely, that deviation from the Confrontation Clause is justified only where there is both a sufficiently important state interest *and* a showing

---

However, upon examining the Supreme Court precedents involving "prior testimony," I am struck by the fact that many of these cases involved the proposed use at trial of a prior statement made in a wholly different, non-trial context. In particular, several of these cases addressed the admissibility of testimony given at a preliminary hearing. *See Roberts*, 448 U.S. at 58, 100 S. Ct. at 2535; *California v. Green*, 399 U.S. at 165-67, 90 S. Ct. at 1938-40; *Berger v. California*, 393 U.S. 314, 89 S. Ct. 540 (1969); *Barber v. Page*, 390 U.S. 719, 720, 88 S. Ct. 1318, 1319 (1968); *Pointer v. Texas*, 380 U.S. 400, 401-02, 85 S. Ct. 1065, 1066-67 (1965); *West v. Louisiana*, 194 U.S. 258, 258-59, 24 S. Ct. 650, 650-51 (1904); *Motes v. United States*, 178 U.S. 458, 467-74, 20 S. Ct. 993, 997-99 (1900).  As observed in *Barber*, "[a] preliminary hearing is ordinarily a much less searching exploration into the merits of a case than a trial, simply because its function is the more limited one of determining whether probable cause exists to hold the accused for trial." *Barber*, 390 U.S. at 725, 88 S. Ct. at 1322.  The remaining "prior testimony" precedents involved testimony given at the defendant's prior criminal trial, where the witness in question had either taken up residence in a foreign country, beyond the reach of the prosecuting state, *see Mancusi v. Stubbs*, 408 U.S. 204, 208-12, 92 S. Ct. 2308, 2311-13 (1972), or had died, *see Mattox*, 156 U.S. at 240, 15 S. Ct. at 338, by the time of the defendant's retrial.

Viewed in this context, it is clear that the requirement of unavailability has been applied in these cases as a rule of "necessity," to ensure that the prosecution relies on "inferior" evidence only where the "better" form of evidence is not reasonably obtainable, and only where the "right of cross-examination initially afforded [during the witness's prior testimony] provides substantial compliance with the purposes behind the confrontation requirement." *Barber*, 390 U.S. at 722, 88 S. Ct. at 1320.  Thus, upon enumerating the various objects served by the Confrontation Clause, the *Mattox* Court then explained:

seeks to admit testimony from a prior judicial proceeding in place of live testimony at trial. In particular, the *Roberts* Court examined the requirement, found in a long line of Confrontation Clause cases involving prior testimony, that before such statements can be admitted the government must demonstrate that the declarant is unavailable. All of the cases cited in *Roberts* for this "unavailability rule" concern prior testimony. In particular, the Court focused on two cases . . . that directly "explored the issue of constitutional unavailability." Both cases specifically limited the unavailability requirement to prior testimony.

*Roberts* must be read consistently with the question it answered, the authority it cited, and its own facts. All of these indicate that *Roberts* simply reaffirmed a longstanding rule . . . that applies unavailability analysis to prior testimony. *Roberts* cannot fairly be read to stand for the radical proposition that no out-of-court statement can be introduced by the government without a showing that the declarant is unavailable.

*Inadi*, 475 U.S. at 392-94, 106 S. Ct. at 1124-25 (citations and footnotes omitted).

Accordingly, in determining whether the prosecution in the present case was compelled to demonstrate the unavailability of Tony Kirklin before introducing his videotaped testimony at Willie Brumley's trial, the dispositive question is whether the proffered evidence counts as "prior testimony" under these precedents. The majority so concludes, with no discussion of the matter. And, of course, Tony Kirklin gave his testimony "prior" to trial, in a purely temporal sense. Further, if we were deciding this case under the rules of evidence or the law of hearsay, we might well conclude that the admission of the videotape should be analyzed under the "former testimony" exception to the rule against hearsay, with its attendant requirement of unavailability. *See* Fed. R. Evid. 804(b)(1).

interest was, of course, "the protection of minor victims of sex crimes from further trauma and embarrassment," an interest which the Supreme Court had previously recognized as "compelling." *Id.* at 852 (quoting *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 607 (1982)). In contrast, the State's interests in the present case are not comparable to the interest at issue in *Craig*. In holding that the State was not required to demonstrate Tony Kirklin's unavailability before considering the reliability of his videotaped testimony, the state courts allowed the State's administrative convenience and budgetary concerns to outweigh Brumley's Sixth Amendment rights.[10] Thus, the state courts' refusal to extend the two-part *Roberts* analysis to the context of videotaped testimony, based simply on the reliability of that medium, was not merely incorrect; it was also unreasonable.

---

that the evidence is sufficiently reliable. Indeed, the *Craig* Court emphasized that "the assurances of reliability" were "far greater" in that case than in other cases, such as *Roberts*, *before* moving on to analyze, separately, the nature of the state interest at issue. *Craig*, 497 U.S. at 851-52. Thus, *Craig* cannot reasonably be read to establish the rule that as the reliability of the proffered evidence increases, the required importance of the state interest decreases. In sum, *Craig* provided the Court with the opportunity to fashion the rule that the dissent favors, but the Court instead fashioned a rule more protective of confrontation rights than that favored by the dissent.

[10]Moreover, it should be added that it will *always* be more convenient and less expensive for the State to videotape the testimony of an incarcerated key witness than it will be for the State to produce the same witness live in court. Although the present case involves the out-of-state language of Ohio Crim. R. 15, one can easily imagine an amendment to that rule permitting the use of videotaped testimony at any time when the witness is incarcerated. If the inconvenience and cost of producing an incarcerated witness from another state are great enough to outweigh the Sixth Amendment rights of a criminal defendant, despite the State's ability to secure the attendance of that witness at trial, then similar considerations would permit the admissibility of the reliable videotaped testimony of an in-state incarcerated witness. If the only factor to be considered is the reliability of the testimony, then what difference does it make whether the witness is incarcerated in Arizona or Mansfield, Ohio?

In short, we must apply *Craig* narrowly for the same reason we must apply *Roberts* broadly — i.e., in order to respect "[t]he central concern of the Confrontation Clause," which the Supreme Court has identified as "ensur[ing] the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding *before the trier of fact*." *Craig*, 497 U.S. at 845 (emphasis added). *Craig* stands for the proposition that a criminal defendant's Sixth Amendment right to confrontation before the trier of fact is outweighed in some cases by a compelling important state interest comparable to the State's interest in protecting the victims of child abuse from further injury. *Craig* cannot reasonably be read to stand for the proposition that the State's interest in conserving its resources in felony cases outweighs a defendant's confrontation rights simply because videotaped testimony is inherently reliable. A contrary holding would in effect permit trial by deposition, the evil that the framers of the Confrontation Clause sought to prohibit, albeit in a different medium. There can be little doubt that such a result would be unreasonable, as it would substitute the State's convenience for the Constitution's requirement of a showing of necessity based upon unavailability.

## 2. The Admission of the Videotaped Deposition Was Not Harmless Error.

### (a) Standard of Review

Habeas relief is only appropriate when the admission of constitutionally inadmissible evidence was not harmless error. To conclude that the admission was not harmless, we must determine that the state-court error had a substantial and injurious effect or influence in determining the jury's verdict. *Hill v. Brigano*, 199 F.3d 833, 846-47 (6th Cir. 1999), *cert. denied*, 529 U.S. 1134; *Gilliam v. Mitchell*, 179 F.3d 990, 995 (6th Cir. 1999), *cert. denied*, 528 U.S. 1120 (2000) (applying harmless-error analysis of *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)).

require the prosecution to produce a seemingly available witness." *Roberts*, 448 U.S. at 65 n.7, 100 S. Ct. at 2538 n.7. In other cases, moreover, the Court has dispensed with the element of unavailability as a prerequisite to the introduction of out-of-court statements. *See, e.g., White*, 502 U.S. at 353-57, 112 S. Ct. at 741-43; *Inadi*, 475 U.S. at 392-400, 106 S. Ct. at 1124-28.

Thus, when specifically called upon in *Inadi* to clarify the scope of the unavailability requirement, the Court emphatically rejected a proposed reading of *Roberts* as holding that "no out-of-court statement [is] admissible without a showing of unavailability." *Inadi*, 475 U.S. at 392, 106 S. Ct. at 1124. The Court explained:

*Roberts* . . . does not stand for such a wholesale revision of the law of evidence, nor does it support such a broad interpretation of the Confrontation Clause. *Roberts* itself disclaimed any intention of proposing a general answer to the many difficult questions arising out of the relationship between the Confrontation Clause and hearsay. "The Court has not sought to 'map out a theory of the Confrontation Clause that would determine the validity of all . . . hearsay "exceptions."'" The Court in *Roberts* remained "[c]onvinced that 'no rule will perfectly resolve all possible problems'" and rejected the "invitation to overrule a near-century of jurisprudence" in order to create such a rule. In addition, the Court specifically noted that a "demonstration of unavailability . . . is not always required." In light of these limiting statements, *Roberts* should not be read as an abstract answer to questions not presented in that case, but rather as a resolution of the issue the Court said it was examining: "the constitutional propriety of the introduction in evidence of the preliminary hearing testimony of a witness not produced at the defendant's subsequent state criminal trial."

The Confrontation Clause analysis in *Roberts* focuses on those factors that come into play when the prosecution

Clause. *See Maryland v. Craig, supra*; *Coy v. Iowa, supra*. The Court has explained that these two lines of authority involve "quite separate" issues and impose distinct requirements. *See White*, 502 U.S. at 358, 112 S. Ct. at 743-44. The majority simply assumes, without discussion, that the present case is controlled by the *Roberts* "out-of-court" line of decisions. For the moment, I too will proceed under this assumption, although I will return to (and question) it later.

Under the facts presented in *Roberts*, where the evidence offered against the accused was the transcript of a witness's preliminary hearing testimony, the Court held that "the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." *Roberts*, 448 U.S. at 65, 100 S. Ct. at 2538. As the majority acknowledges, however, *Roberts* goes on to explain that "[a] demonstration of unavailability . . . *is not always required*." 448 U.S. at 65 n.7, 100 S. Ct. at 2538 n.7 (emphasis added). Nevertheless, the majority characterizes the present case, like *Roberts*, as involving "prior testimony," so that the requirement of unavailability applies with full force here. Because the Ohio appellate court ruled that the prosecution was "not required to demonstrate the 'unavailability' of [Tony Kirklin], as that term was defined by the United States Supreme Court in *Roberts*," (J.A. at 547), the majority holds that this state court decision was contrary to the rule of law set forth in *Roberts*.

However, upon reviewing the entire line of Supreme Court decisions addressing out-of-court statements, including those cases in which the Court did not require a showing of unavailability, I do not believe that the Ohio appellate court acted contrary to the relevant Supreme Court precedents, or that it unreasonably applied those precedents, in declining to insist that Tony Kirklin be absolutely unavailable in order to admit his videotaped testimony at trial. As noted, *Roberts* itself recognizes that unavailability is not a categorical precondition to the admission of out-of-court declarations, and it cites *Dutton v. Evans, supra,* as a case where "the Court found the utility of trial confrontation so remote that it did not

#### (b)  Analysis

Adopting the magistrate judge's report and recommendation, the district court concluded that the admission of the videotaped deposition was not harmless error, at least with regard to Brumley's complicity to commit aggravated murder conviction. The magistrate judge concluded that there was sufficient evidence, without the videotaped deposition, to convict Brumley of kidnaping because the testimony of Davis adequately set forth the elements of the kidnaping charge. However, the magistrate judge concluded that "[w]ithout Tony Kirklin's testimony, a reasonable jury could not convict Brumley of complicity to commit aggravated murder." J.A. at 3687. This conclusion was based on the following considerations:

> Tony Kirklin was the only witness to come forward that observed Brumley give the weapon used to murder Becky Knapp to Delmar Kirklin. He was also the only witness [who] heard Brumley direct Delmar Kirklin to "waste her." Without this crucial testimony, no evidence existed which would have shown that Brumley solicited or aided or abetted Delmar Kirklin in the murder. It appears that all other evidence at trial merely places Brumley at the scene of the murder which in itself is not a crime.

J.A. at 3687-88. In short, without the admission of the videotaped testimony of Tony Kirklin, the district court concluded that the jury could not have found Brumley guilty of complicity to commit aggravated murder. Thus, the admission of that testimony had a substantial and injurious impact on the jury's verdict.

The State argues on appeal that the district court misapplied the *Brecht* standard. Instead of applying the *Brecht* standard to the impact of the admission of the videotaped deposition, the State first argues that we should determine whether the presentation of the evidence on videotape, instead of the live testimony of Tony Kirklin, had a substantial impact: "Simply stated, it must be determined how the testimony of Anthony

Kirklin would have impacted the jury verdict had it been presented live in-court as opposed to on videotape." Appellant's Br. at 23.  The State argues that "Brumley can demonstrate little or no injurious effect from the presentation of the videotape as opposed to live testimony." *Id.*  The State continues:  "In other words, if Anthony Kirklin was unavailable, his testimony by videotape would not have violated the Confrontation Clause.  If Anthony Kirklin was available, Brumley cannot demonstrate how his testimony would have differed from that contained on the videotape." *Id.* at 24.

This specious argument is undermined by both this court's harmless-error jurisprudence as well as by its own logic.  In terms of logic, the State's position is that the admission into evidence of the videotaped deposition testimony of constitutionally available witnesses will always be harmless error — at least in cases where defense counsel has cross-examined the deponent — because the defendant/petitioner will *never* be able to show that he was harmed by the admission of the constitutionally infirm evidence. The State's position completely ignores the importance of live, in-court testimony recognized by the Supreme Court since at least 1895 in *Mattox*.  *See Mattox*, 156 U.S. at 242-43.

In terms of this court's harmless-error jurisprudence, the proper standard by which to gauge the injurious impact of the admission of constitutionally infirm evidence is to consider the evidence before the jury absent the constitutionally infirm evidence. *See Gilliam*, 179 F.3d at 995 (holding admission of taped confession of witness invoking Fifth Amendment privilege to be harmless error on the basis of the other evidence admitted at trial); *Stoner v. Sowders*, 997 F.2d 209, 213 (6th Cir. 1993) (rejecting argument that the admission of the videotaped testimony of available key witnesses was harmless error by examining the rest of the trial record).

The State thus argues in the alternative that the evidence on the record supports Brumley's conviction for complicity to commit aggravated murder even without Tony Kirklin's

can conclude otherwise, in my view, is by removing the relevant Supreme Court decisions from their limited contexts — contexts which the Court itself emphasized were crucial to its holdings — and transmuting them into inviolate rules of constitutional law governing the far different set of circumstances presented here.

The premise underlying the majority opinion is simply stated.  In *Ohio v. Roberts*, 448 U.S. 56, 100 S. Ct. 2531 (1980), the Supreme Court held that a written transcript of a witness's testimony at a preliminary hearing was properly admitted into evidence at a subsequent criminal trial, where the witness in question was not available to testify at the trial and defense counsel was able to cross-examine this witness at the preliminary hearing.  In so ruling, the Court set forth a two-part test for the admission of hearsay evidence over a defendant's Confrontation Clause challenge:  (1) the prosecution must either produce the out-of-court declarant at trial or demonstrate his unavailability, and (2) the evidence must bear adequate "indicia of reliability" to warrant its admission at trial.  *Roberts*, 448 U.S. at 65-66, 100 S. Ct. at 2538-39.  The majority finds *Roberts* directly controlling here, and then holds that the Ohio courts either dispensed entirely with the "unavailability" prong of the *Roberts* test or improperly determined that it had been satisfied.

I take a different view on both aspects of the majority's analysis.  Initially, I note that *Roberts* is part of a distinct line of Supreme Court decisions addressing the effect of the Confrontation Clause upon the introduction of *out-of-court* declarations at trial.  *See*, *e.g.*, *White v. Illinois*, *supra*; *United States v. Inadi*, 475 U.S. 387, 106 S. Ct. 1121 (1986); *California v. Green*, *supra*.  Separately, the Supreme Court has issued a pair of rulings addressing the procedures necessary for *in-court* testimony to satisfy the Confrontation

---

likewise applied only the "unreasonable application" and not the "contrary to" prong of § 2254(d)(1), recognizing that "the Supreme Court has not had occasion to apply" the requirement of witness unavailability in the context of videotaped testimony.  (J.A. at 3775.)

apply to the facts before us. Indeed, we are not even concerned with ascertaining the "correct" interpretation of the Confrontation Clause, although I believe that this inquiry is highly instructive to the issue before us. Rather, our task here is narrowly circumscribed by the terms of the federal Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), under which we may not grant the habeas relief sought by Petitioner Willie Brumley unless the challenged state court ruling "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see also Williams v. Taylor*, 120 S. Ct. 1495, 1518-23 (2000) (construing this provision).

The majority purports to apply these AEDPA standards, and then concludes that the Ohio court's decision to admit the videotaped testimony of Tony Kirklin was *both* contrary to *and* an unreasonable application of the relevant Supreme Court precedents. This analysis, in my judgment, utterly subverts the plain intent of Congress, in enacting the AEDPA, to "place[] a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." *Williams*, 120 S. Ct. at 1523. The case before us, with its unique set of facts that invite to consider what lies at the core of the constitutional right of confrontation, seemingly provides ample ground for reasonable minds to differ, and this counsels against the exercise of our limited power under the habeas statute.[5] The only way the majority

---

[5] The majority's application of the "contrary to" clause of § 2254(d)(1) is particularly troubling, as this clause is triggered only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than th[e] Court has on a set of materially indistinguishable facts." *Williams*, 120 S. Ct. at 1523. As discussed in detail below, the Supreme Court's Confrontation Clause decisions are so readily distinguishable that it seems inconceivable to me that the challenged Ohio court rulings in this case could be found to satisfy this standard. Even Brumley's own counsel acknowledged at oral argument that the habeas statute's "contrary to" prong does not apply here, and the District Court

---

videotaped deposition. The State points to the testimony of Davis and Sanders to support this argument. Davis, an occupant of the Grand Prix on the day of the murder, testified to the facts of the incident until the production of the murder weapon by Brumley, including Brumley's statement that the victim had seen the Grand Prix's license plates. After Brumley produced the revolver, however, Davis testified that he started running toward home and thus did not see anything else. As he was running, Davis heard two shots fired. Sanders testified to Brumley's incriminating statements in prison but was not a witness to any of the relevant events.[11]

We hold that Tony Kirklin's videotaped testimony had a substantial and injurious effect or influence in determining the jury's verdict. The testimony of Davis and Sanders is limited. Davis did not testify that he heard Brumley tell Delmar Kirklin to "waste" Becky Knapp, nor did he testify that Brumley handed Delmar the revolver for that purpose. Because he ran away, Davis did not witness the shooting itself, as did Tony. Sanders's testimony is rather incoherent and establishes (at most) that Brumley said that Kirklin shot Knapp. None of the other witnesses called at trial testified to Brumley's handing of the revolver to Delmar, to Brumley's statement to Delmar to "waste" Knapp, or to the shooting itself. This is not a case where the substance of the challenged testimony was already before the jury from other sources. *See Hill*, 199 F.3d at 847. Instead, this is a case in which "the deposition[] [was] the key piece of evidence." *Stoner*, 997 F.2d at 213. Tony Kirklin was clearly the State's principal witness. As a result, there can be "no doubt that the

---

[11] Of the five men in Delmar's Grand Prix on the day of the murder of Knapp — Brumley, Delmar Kirklin, Tony Kirklin, Kevin Davis, and Marty Marshall — only Davis and Tony Kirklin (by videotaped deposition) testified during the guilt phase of Brumley's trial. The defense planned on calling Delmar at one point in the trial but instead did not put on a case. Brumley did not testify on his own behalf in the guilt phase. Marshall testified during the mitigation phase. His testimony differs in many respects from that of Tony Kirklin. Specifically, Marshall testified that Brumley never handled the revolver, never pointed the revolver at Knapp, and never told Delmar to "waste" her. J.A. at 2350.

guilty verdict on that count was substantially influenced by the admission of [the videotaped] testimony." *Id.* at 213-14.

### C.    The District Court Did Not Abuse Its Discretion in Denying the State's Motion for Post-Judgment Relief.

We review a district court's denial of a Rule 60(b) motion under the abuse of discretion standard. *See Futernick v. Sumpter Township*, 207 F.3d 305, 313 (6th Cir. 2000). Applying this standard, we affirm the district court's denial of the State's motion for relief under Rule 60(b)(1). Rule 60(b)(1) states that "[o]n motion and upon such terms as are just, the court may relieve a party . . . from a final judgment, order, or proceeding for . . . mistake, inadvertence, surprise, or excusable neglect." Fed. R. Civ. P. 60(b)(1). The district court did not abuse its discretion in denying the State's motion for relief. We have previously held that a district court does not abuse its discretion when it denies post-judgment relief to a party raising the same issues and arguments post-judgment as those rejected by the district court in its prior (final) judgment. *See Futernick*, 207 F.3d at 313. Similarly, in the present case the State did not offer any arguments in its objections to the magistrate judge's report and recommendation that the magistrate judge — and thus the district court, in adopting the magistrate judge's recommendation — had not already rejected.

The State raises three objections to the magistrate judge's report and recommendation. First, the State argues that the admission of the videotaped deposition testimony did not violate Brumley's confrontation rights because Brumley was given an opportunity to cross-examine the deponent. But the magistrate judge's report and recommendation correctly focused on the issue of unavailability, thus rejecting the State's emphasis on the reliability of the testimony. Second, the State argues that the use of a videotaped deposition, as opposed to a transcribed deposition, serves Confrontation Clause values by better permitting the jurors to evaluate the demeanor of the deponent. The magistrate judge clearly rejected this argument: "Videotaped testimony clearly has its

this sort of policy determination in the guise of a constitutional ruling.[4]

Indeed, we should be particularly reluctant to do so here, where (i) the constitutional provision in question says nothing one way or the other on the subject, (ii) the accused undeniably has been afforded the specific right guaranteed under the literal language of this provision — namely, "to be confronted with the witnesses against him," and (iii) all of the purposes underlying the constitutional guarantee have been achieved. Under the circumstances presented in this case, where any deviations from the traditional practice of live testimony at trial did not result in any denial of the core constitutional right of confrontation or, so far as the record reveals, undermine any of its purposes, I would hold that the admission of the videotaped testimony of Tony Kirklin at Willie Brumley's trial did not violate Brumley's rights under the Confrontation Clause.

### B.    The State Court's Ruling Satisfies the Narrow Standard of Review Governing Federal Habeas Corpus Proceedings.

As the foregoing analysis indicates, I believe that the admission of Tony Kirklin's videotaped testimony at Willie Brumley's trial, if viewed as a question of first impression, would satisfy a proper construction of the Sixth Amendment's Confrontation Clause. But, of course, this is not the test we must apply in considering Brumley's habeas petition, and we may not engage here in the conventional common-law endeavor of reviewing the constitutional text and the judicial precedents and determining for ourselves how they should

---

[4] Notably, under the same logic that would construe the Confrontation Clause as forbidding the use of videotaped testimony, a court could just as readily conclude that microphones and speakers should not be allowed in the courtroom, because they distort to some degree the unamplified speaking voices of the witnesses, and thereby diminish the "pure" right of confrontation and the jury's opportunity to assess demeanor — at least as compared to the "ideal" of, presumably, an 18th Century courtroom without such technology.

Confrontation:  (1) insures that the witness will give his statements under oath — thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the "greatest legal engine ever invented for the discovery of truth"; [and] (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility.

*Green*, 399 U.S. at 158, 90 S. Ct. at 1935 (footnote with citation omitted).

To be sure, one could make a policy judgment, presumably based on sociological evidence that is nowhere in the record before us, that live testimony is so far preferable to a videotaped version of the same testimony that the latter[3] should be allowed only in extraordinary circumstances. Having reached such a conclusion, one could then codify it in, say, the Federal Rules of Evidence, which often reflect such prudential concerns.  Yet, it is quite another matter to throw the weight of the Constitution behind one side or the other in such a debate, and I believe that judges should resist making

---

[3]The available anecdotal evidence suggests that it is simply different to view a speaker live versus on videotape, and that one form of viewing cannot readily be characterized as "better" than the other.  The first Kennedy/Nixon debate during the 1960 presidential campaign provides a well-known illustration of this phenomenon. The widespread consensus that Kennedy won this contest owes much more to the visual images projected by the two candidates on television than to what actually was said during the debate.  *See* Theodore H. White, The Making of the President 1960, at 288-90 (1961).  "It was the picture image that had done it," with Nixon appearing slouched, unshaven, and haggard after a recent illness. *Id.* at 289-90.

This acknowledged distinction between live and televised images, however, tells us little about which mode of communication might better serve the truth-seeking function of a trial.  For what it is worth, I daresay that the average juror has a good deal more experience in assessing the demeanor and credibility of people on television than of individuals on the witness stand in a courtroom.

---

disadvantages when used in lieu of live, in-court testimony." J.A. at 3683.  Third, the State argued that, if the admission of the deposition violated Brumley's confrontation rights, then it was harmless error.  The magistrate judge rejected this conclusion, as well.

The district court reconsidered these issues after the State filed its objections to the magistrate judge's report and recommendation and again adopted the magistrate judge's recommendations.  Thus, we hold that the district court did not abuse its discretion in denying the State's motion for relief under Rule 60(b)(1).  The district court had already considered the merits of the State's arguments and rejected them; when given an opportunity to file objections, the State failed to offer any reasons for the district court to revisit its order granting habeas relief.

### III. CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's granting of habeas relief to Brumley on his conviction for complicity to commit aggravated murder.  Moreover, we **AFFIRM** the district court's denial of the State's motion for post-judgment relief.

---

**DISSENT**

---

ROSEN, District Judge, dissenting.

## I. *INTRODUCTION*

This habeas action calls upon us to examine the impact of modern technology upon the core constitutional values which underlie the Sixth Amendment's Confrontation Clause, as well as the proper role of the federal courts in reviewing state court decisions which interpret these values. Because of the importance of these issues, and because I firmly disagree with virtually every element of the majority's analysis of these matters, I write at some length to respectfully register my dissent.

Specifically, this action arises from the decision of a state trial court to admit, over a Sixth Amendment Confrontation Clause challenge, the videotaped testimony of witness Tony Kirklin at the trial of Petitioner/Appellee Willie Brumley on charges of complicity to commit aggravated murder and kidnaping. Kirklin gave the challenged testimony shortly before Brumley's trial, in a courtroom with the trial judge presiding, and for the specific, fully anticipated, and expressly disclosed purpose of presenting this videotaped testimony in lieu of Kirklin's live testimony at the forthcoming trial. Kirklin testified in the presence of Brumley and his trial counsel, as well as Brumley's friends and relatives in the gallery, and Brumley's counsel extensively cross-examined and re-cross-examined the witness. This testimony then was fully presented to the jury a short time later in the very same courtroom. To this day, Brumley has offered neither evidence nor argument that Kirklin's testimony or his cross-examination by defense counsel would have deviated in any respect whatsoever from the videotaped version if the prosecution had been compelled to again incur the expense and administrative burden of bringing Kirklin from Arizona

opportunity was preserved in this case through the videotaping of Kirklin's testimony.

In addition, and as pointed out by Brumley's counsel in opposing the videotaping procedure sought by the prosecution, it is conceivable that new developments between the time of the witness's testimony and the time of trial might undermine or weaken the initial confrontation, and give rise to a desire to "re-confront" the witness. For example, another witness might change his story, or new evidence might be uncovered that bears upon the previously taken testimony. Yet, while this might well be a legitimate concern under a different set of facts and circumstances, there is nothing in the record before us that suggests there were any such new developments in this case. While Brumley's counsel was aware of and expressly raised this concern before Kirklin testified, the record tellingly is devoid of any material changes in circumstances between the date of this testimony and the time of trial, just over a month later. Moreover, even with the benefit of hindsight and a complete trial transcript, Brumley has not pointed to any developments at or before trial that gave rise to a need, or even a desire, to recall Kirklin for further cross-examination. In short, there is no reason to believe that Kirklin's live testimony at trial would have deviated in any way from the videotaped version that was presented to the jury.

Accordingly, I find no constitutional significance in the two respects in which Brumley's opportunity to confront Kirklin might have differed from some imagined "ideal" of confrontation. Certainly, the literal terms of the Confrontation Clause itself do not require a "live" confrontation between accuser and accused in front of the jury and at the time of trial. Moreover, the drafters of the Sixth Amendment could not possibly have formed an opinion as to the relative merits of live versus videotaped confrontation. Finally, the procedure employed in this case fully achieved all of the purposes of confrontation as identified by the Supreme Court in *Green*:

it important that a confrontation should occur in front of the trier of fact. In *Mattox*, for example, the Court envisioned "a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury *in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief*." *Mattox*, 156 U.S. at 242, 15 S. Ct. at 339 (emphasis added). Similarly, Dean Wigmore's treatise opines that an element, albeit "secondary and dispensable," of the right of confrontation is the ability to compel "the presence of the witness before the tribunal so that his demeanor while testifying may furnish such evidence of his credibility as can be gathered therefrom." 5 John Henry Wigmore, Evidence § 1399, at 199 (Chadbourn rev. 1974).

Even assuming that the Confrontation Clause encompasses this opportunity for the trier of fact to actually gaze upon the accuser as he confronts the accused, the jury certainly had such an opportunity in this case. Through the technology of videotape, the jury was able to directly witness and assess Tony Kirklin's demeanor as he testified against Willie Brumley, and to use this information in determining the weight to give to Kirklin's testimony. Plainly, the language of the Confrontation Clause itself does not compel a distinction between live and videotaped confrontations; indeed, as noted, the Clause does not expressly require that the jury witness the confrontation at all, whether as it happens or otherwise.

Second, Brumley's opportunity to confront Kirklin arguably fell short of the "ideal" because it did not occur "at the time of trial," as seemingly called for in certain Supreme Court rulings. *See*, *e.g.*, *Green*, 399 U.S. at 157, 90 S. Ct. at 1934. Again, since the Sixth Amendment itself imposes no such requirement, it is appropriate to consider the purposes that might be served by such a condition. One apparent advantage of confrontation at trial is that the trier of fact then has an opportunity to witness it. As just discussed, however, this

to Ohio for Brumley's trial, just over a month after this same costly process had been employed to secure Kirklin's presence at the trial of Brumley's co-defendant.

In my view, this record establishes that Willie Brumley fully availed himself of his Sixth Amendment right "to be confronted with the witnesses against him," and specifically Tony Kirklin. The majority concludes otherwise, reading the relevant Supreme Court precedents as stating an inviolable requirement that a witness be produced live at trial if at all possible. Perhaps more remarkably, the majority holds that its interpretation of these precedents is the only permissible one, and that the Ohio courts' different analysis of the constitutional right of confrontation was both "contrary to" and an "unreasonable application" of these Supreme Court decisions rendered under highly dissimilar facts.

Neither the Confrontation Clause nor Supreme Court precedent mandates this result. Rather, I would hold that the Ohio courts reasonably construed the decisions of the Supreme Court as permitting the introduction of videotaped witness testimony taken for the specific purpose of trial, in a trial-like setting, and with full opportunity for cross-examination by the accused.

## II.    *FACTUAL AND PROCEDURAL BACKGROUND*

Although the majority opinion sets forth most of the pertinent background of this case, I wish to highlight a few important facts and circumstances surrounding the videotaped testimony at issue in this appeal. First, while the majority consistently refers to Tony Kirklin's "deposition testimony," this characterization tends to obscure the degree to which Kirklin's testimony was given in a fully trial-like setting. He testified under oath in the very same courtroom in which Brumley was tried just over a month later. Brumley and his trial counsel were present, and Brumley's family and friends were permitted to remain in the courtroom's gallery to observe Kirklin's testimony. Moreover, the trial judge presided over this proceeding, after first stating his reluctance to "be involved in taking depositions," where the prosecutor

noted the somewhat unusual "nature of these circumstances" and the desire "to have as clean a videotape for presentation at trial, if the need arises." (J.A. at 51.) In short, the examination took place just as the jury would have seen it live.

Next, all parties, the prosecution and defense alike, understood that Kirklin's testimony was being taken and preserved on videotape for use at Brumley's trial, and for no other purpose. In requesting this videotaped proceeding under Ohio Criminal Rule 15(A),[1] the prosecutor stated:

> As the court is aware from what has been stated in our written motion, the witness in this matter, Anthony Kirklin, who is the brother of [Brumley's] co-defendant, Delmar Kirklin, whose case has already been disposed of, is currently a resident of Arizona and is incarcerated there on a — a felony matter. In order to obtain the appearance of this witness in the Delmar Kirklin case, which had been set for trial here a few weeks ago, it was necessary for the State to first obtain an order in the appropriate Circuit Court in Arizona . . . requiring the attendance of Anthony Kirklin at this trial.
>
> Second, the State must then have two deputy sheriffs go out, get him, bring him back, take him out and then come back again, which takes a total of five round trip tickets at the state's expense as well as the related housing for the deputies while they are out there. [Thi]s

---

[1] As noted by the majority, this Rule provides, in pertinent part:

> If it appears probable that a prospective witness will be unable to attend or will be prevented from attending a trial or hearing, and if it further appears that his testimony is material and that it is necessary to take his deposition in order to prevent a failure of justice, the court at any time . . . shall upon motion of the defense attorney or the prosecuting attorney and notice to all the parties, order that his testimony be taken by deposition.

Ohio Crim. R. 15(A).

sworn witness against him, Tony Kirklin, under conditions that matched those of his forthcoming trial, with the trial judge presiding and his friends and relatives present in the courtroom.

Moreover, the prosecution did not look to some other proceeding arising in a wholly different context, such as a preliminary hearing, to obtain the evidence it offered against Brumley at trial. To the contrary, Kirklin's testimony was used precisely and solely for the purpose for which it was taken, as a substitute for Kirklin's actual, physical presence during the trial. Simply stated, Willie Brumley was "confronted with the witness[] against him," in full compliance with the plain language of the Confrontation Clause. In fact, the same can be said even if this constitutional provision is construed as requiring not just the face-to-face meeting encompassed within its literal terms, but also an adversarial process in which the accused is afforded the opportunity to challenge his accuser and test his accusations.

There are only two conceivable respects in which the confrontation between accused and accuser in this case fell short of some imagined "ideal" — leaving aside, for the moment, the question whether this "ideal" is enshrined in the Sixth Amendment's Confrontation Clause. First, as noted, the Supreme Court has spoken of a defendant's right to a "face-to-face meeting with witnesses appearing before the trier of fact," *Coy*, 487 U.S. at 1016, 108 S. Ct. at 2801, and has stated that the Confrontation Clause ensures the opportunity "of compelling [an accuser] to stand face to face with the jury," *Mattox*, 156 U.S. at 242, 15 S. Ct. at 339. Here, the confrontation between Brumley and his accuser did not occur "live" in front of the jury, but took place in the courtroom a few weeks before trial, and was preserved on videotape for subsequent presentation to the jury in that same courtroom.

The significance of this fact is greatly diminished, however, when it is recalled *why* the courts and commentators believe

Over the course of centuries, English writers praised the openness of the English system. That is not to say, however, that the norm of having the witness testify before the accused at trial was always maintained in England. Some courts in England, such as the Court of the Star Chamber, adhered to the procedures of the Continent rather than to those of the common law. But precisely for this reason, these courts were politically controversial, and most of them were abolished in the seventeenth century; the equity courts survived, but without criminal jurisdiction. Moreover, the common law courts were not above using equity procedures when it turned out that a witness was unavailable to testify at trial. Before the middle of the seventeenth century, the common law courts developed a sophisticated body of doctrine governing when it was acceptable to use at trial equity depositions taken of witnesses no longer available. And, perhaps most importantly for our purposes, in politically charged trials in the Tudor and early Stuart eras, especially trials for the crime of treason, the authorities did not always bring the accusing witnesses to the trial. But, beginning even before the middle of the sixteenth century, we find repeated demands by treason defendants that their accusers be brought "face-to-face," and also repeated statutory support for this position. By the middle of the seventeenth century, this position, and the accused's right to examine the witnesses, had prevailed.

Friedman, *supra,* at 1022-24 (footnotes with citations omitted).

Returning to the present case, it is immediately evident that it does not present anything remotely resembling the "paradigmatic evil" of trial by affidavit that the Confrontation Clause was intended to prevent. Willie Brumley was not subjected to trial by anonymous accusers, nor was he called upon to answer to *ex parte* statements gathered by the prosecution outside his presence. To the contrary, he was afforded a full and fair opportunity to cross-examine the

is not an insignificant sum, runs into thousands of dollars.

Third[], in this matter there is a possibility that the defendant will be released from the institution [in Arizona] on parole by the time this matter will come up for trial. Being a resident of another state he would be beyond the subpoena power [of] the State of Ohio. The defendant in this matter is charged with aggravated murder, a very serious offense. This witness, Anthony Kirklin, is an eyewitness to those events and a witness who is critical to the . . . presentation of the State's case. We think that it is very necessary to preserve his testimony by way of stenographic transcript, as well as videotape so that it can be presented at trial in lieu of his live testimony if he's unavailable to us. Therefore we ask the court to permit us to proceed with the taking of the deposition today.

(J.A. at 41-43.)

Brumley's counsel vigorously opposed the State's request, principally on the grounds (i) that the State had not made a sufficient showing under Rule 15(A) that Tony Kirklin would be "unable to attend" Brumley's trial, particularly where the State apparently "had no problem in obtaining his presence for the co-defendant's trial," (J.A. at 46-47); (ii) that the expense involved in bringing Tony Kirklin back to Ohio for Brumley's trial was not a cognizable basis under Rule 15(A) for taking Kirklin's deposition; and (iii) that the introduction of Kirklin's videotaped testimony at trial would violate Brumley's right of confrontation under the state and federal constitutions, because "the jury needs to see the witness live on the stand, at the time the trial is actually going on, to be able to assess his credibility," and because Kirklin's absence at trial might present the "predicament" that the defense would be unable "to question Mr. Kirklin further on various issues that other witnesses have testified to" during the trial. (J.A. at 48-50.) The trial court, however, permitted the proceeding to go forward, explaining:

I have had this gentleman [Tony Kirklin] in my jail, my jail is full up, for the last week has been over the population allowed by the Federal Judge and they are all felons, don't have any misdemeanors to put out. So my jail is full and I have to send [Kirklin] back from whence he came. Can't keep him there. I don't have any room in the inn. Your client is present, and there will be the possibility of . . . direct and cross-examination of the witness with your client present, and that will be placed on videotape . . . . I think we meet the requirement that he has the right to confront the witnesses that testify against him.

\* \* \* \*

Obviously, [Kirklin] is, as the prosecutor indicates to me, a material witness as to what happened and he will be out of state, in an institution, in another state. That of course is beyond the subpoena power of the State of Ohio, although there would be a possibility to return him, if necessary . . . . [Brumley's] motion . . . to cancel the deposition, will be denied. I think the rules provide for it. There is no way that your client can be prejudiced by taking the deposition. As a matter of fact, it might be a benefit to him in taking the deposition. Absolutely then we will know and you will have a copy of . . . exactly what this witness has said in the courtroom, and would say if he's called as a witness.

(J.A. at 49-50.)[2]

Thus, as the parties concluded their arguments on April 28, 1989 and proceeded to take Kirklin's testimony, Brumley and his counsel were fully aware that this videotaped proceeding might well be presented to the jury in lieu of Kirklin's live testimony at trial, and they acted in accordance with this understanding. Indeed, in the course of cross-examination, Brumley's counsel more than once called upon Kirklin to

---

[2]The court also instructed, however, that the record of Kirklin's testimony be sealed pending further order of the court, so that neither side could use this material to its advantage in preparing for trial.

prisoner in lieu of a personal examination and cross examination of the witness . . ."); *California v. Green,* 399 U.S., at 156, 90 S.Ct., at 1934 ("It is sufficient to note that the particular vice that gave impetus to the confrontation claim was the practice of trying defendants on 'evidence' which consisted solely of *ex parte* affidavits or depositions secured by the examining magistrates, thus denying the defendant the opportunity to challenge his accuser in a face-to-face encounter in front of the trier of fact"); *id.,* at 179, 90 S.Ct., at 1946 (Harlan, J., concurring) ("From the scant information available it may tentatively be concluded that the Confrontation Clause was meant to constitutionalize a barrier against flagrant abuses, trials by anonymous accusers, and absentee witnesses"); *Dutton v. Evans,* 400 U.S., at 94, 91 S.Ct., at 222 (Harlan, J., concurring in result) (the "paradigmatic evil the Confrontation Clause was aimed at" was "trial by affidavit").

*White v. Illinois*, 502 U.S. 346, 361-62. 112 S. Ct. 736, 745-46 (1992) (Thomas, J., concurring in part and concurring in judgment).

A recent scholarly review of the origins of the Confrontation Clause reached a similar conclusion:

We are used to the idea that witnesses testify under oath in an open proceeding in the presence of the accused, "face-to-face." This was the practice of the ancient Hebrews and Romans, and for centuries it has been the English way. It was described in especially vivid terms by Thomas Smith in the sixteenth century as an "altercation." But this is not the only way in which testimony might be given in a judicial proceeding. Smith presented his account of English law as contrasting with the system that then prevailed in Continental Europe. There, testimony was taken under oath but out of the presence of the parties. Often it was taken in front of a notary rather than at the tribunal itself, and was later presented to the tribunal in written form.

confessions of accomplices, letters, and the like; and this occasioned frequent demands by the prisoner to have his 'accusers,' *i.e.,* the witnesses against him, brought before him face to face . . . ." *Id.,* at 326. See also 5 Wigmore, *supra,* § 1364, at 13 ("[T]here was . . . no appreciation at all of the necessity of calling a person to the stand as a witness"; rather, it was common practice to obtain "information by consulting informed persons not called into court"); 9 W. Holdsworth, History of English Law 227-229 (3d ed. 1944). The infamous trial of Sir Walter Raleigh on charges of treason in 1603 in which the Crown's primary evidence against him was the confession of an alleged co-conspirator (the confession was repudiated before trial and probably had been obtained by torture) is a well-known example of this feature of English criminal procedure. See Pollitt, The Right of Confrontation: Its History and Modern Dress, 8 J.Pub.L. 381, 388-389 (1959); 1 Stephen, *supra,* at 333-336; 9 Holdsworth, *supra,* at 216-217, 226-228.

Apparently in response to such abuses, a common-law right of confrontation began to develop in England during the late 16th and early 17th centuries. 5 Wigmore, *supra,* § 1364, at 23; Pollitt, *supra,* at 389-390. Justice Story believed that the Sixth Amendment codified some of this common law, 3 J. Story, Commentaries on the Constitution of the United States 662 (1833), and this Court previously has recognized the common-law origins of the right, see *Salinger v. United States,* 272 U.S. 542, 548, 47 S.Ct. 173, 175, 71 L.Ed. 398 (1926) ("The right of confrontation did not originate with the provision in the Sixth Amendment, but was a common-law right having recognized exceptions"). The Court consistently has indicated that the primary purpose of the Clause was to prevent the abuses that had occurred in England. See *Mattox v. United States,* 156 U.S. 237, 242, 15 S.Ct. 337, 339, 39 L.Ed. 409 (1895) ("The primary object of the [Confrontation Clause] was to prevent depositions or *ex parte* affidavits, such as were sometimes admitted in civil cases, being used against the

explain certain matters for the benefit of "the ladies and gentlemen of the jury." (J.A. at 129, 159.) Moreover, the record plainly demonstrates the vigorous nature of this cross-examination, during which Brumley's counsel elicited, among other damaging concessions, Kirklin's testimony (i) that he had lied to avoid being implicated in a murder and "to protect my brother," co-defendant Delmar Kirklin, in his prior testimony before the grand jury and in a prior written statement to prosecutors, (J.A. at 136-37, 149-53); (ii) that he had consumed a substantial amount of alcohol by the time the victim, Becky Knapp, was shot; (iii) that he was unsure who produced the murder weapon or exactly "who said what" in the moments leading up to the shooting, (J.A. at 136); and (iv) that "it would be nice" if, in exchange for his testimony, the prosecution gave him a favorable recommendation for use in his upcoming parole hearing in Arizona, (J.A. at 163-64).

Finally, and perhaps most importantly in the context of a Confrontation Clause challenge, there is not even a suggestion in the record of any material changes in the case between the date of Kirklin's videotaped testimony on April 28, 1989 and the commencement of Brumley's trial a few weeks later, on June 6, 1989. Although, as noted earlier, Brumley's counsel expressly cited this possibility of intervening circumstances as a basis for opposing Kirklin's videotaped testimony, the only such change he was able to identify at the time of trial was an amendment to the indictment. (*See* J.A. at 1668.) Yet, as the prosecution immediately pointed out, the trial court previously had ruled that this amendment did not in any way alter the substance of the indictment. (*See id.* at 1672.) Consequently, as the prosecution observed, this same amendment would have been proper even at the close of the State's case — and, thus, after Kirklin's testimony even if offered live at trial. (*See id.*) Notably, Brumley's counsel did not attempt to rebut the State's position by identifying any ways in which the amended indictment might have altered his cross-examination of Kirklin.

Apart from this, there is no suggestion in the record before us of any intervening developments that might have given rise

to a desire to re-call or re-cross-examine Tony Kirklin at trial in order to explore issues beyond those addressed in his testimony a few weeks earlier. Even with the benefit of hindsight and a complete trial record, Brumley's brief on appeal is conspicuously lacking in any sort of claim that he was denied a full and fair opportunity to cross-examine Kirklin on any of the matters upon which this witness testified. In short, we must conclude, on the record before us, that Kirklin's live testimony at trial would not have deviated in any respect from his videotaped testimony given a short time earlier.

## III. *ANALYSIS*

**A. The Plain Language and Historical Background of the Sixth Amendment's Confrontation Clause Support the State Court's Decision to Admit the Videotaped Testimony of Tony Kirklin at Willie Brumley's Trial.**

In analyzing Petitioner/Appellee Brumley's Sixth Amendment challenge to the admission of Tony Kirklin's videotaped testimony at his trial, the starting point necessarily is the language of the Confrontation Clause itself, which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const., amend VI. On its face, this language could hardly be more clear and direct. Yet, as is often the case, this straightforward language has produced myriad views as to the "true essence" of the right of confrontation.

One need look no further than the leading Supreme Court decisions on the subject, which variously state, for example, that the "literal right to 'confront' the witness at the time of trial . . . forms the core of the values furthered by the Confrontation Clause," *California v. Green*, 399 U.S. 149, 157, 90 S. Ct. 1930, 1934-35 (1970); or that "[t]he primary object of the constitutional provision in question was to prevent depositions or ex parte affidavits . . . being used against the prisoner in lieu of a personal examination and cross-examination of the witness," *Mattox v. United States*,

*Craig*, *supra*. This procedure, like the screen used in *Coy*, allowed the defendant to observe his accuser as he or she testified, but prevented the child witness from seeing the accused. The result, as Justice Scalia observed in dissent, was a seemingly complete denial of a "categorical guarantee of the Constitution" — namely, "a defendant's right to face his or her accusers in court." *Craig*, 497 U.S. at 860-61, 110 S. Ct. at 3171 (Scalia, J., dissenting). Nevertheless, upon reviewing the Court's Confrontation Clause precedents, the majority observed that "we cannot say that [face-to-face] confrontation is an indispensable element of the Sixth Amendment's guarantee of the right to confront one's accusers." 497 U.S. at 849-50, 110 S. Ct. at 3166. Rather, the Court reasoned that reliability is the "central concern of the Confrontation Clause." 497 U.S. at 845, 110 S. Ct. at 3163. Consequently, the opportunity for face-to-face confrontation may be denied where "necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." 497 U.S. at 850, 110 S. Ct. at 3166.

It seems fair to say, then, that this jurisprudence falls short of identifying a core set of principles promoted by the Confrontation Clause. Yet, despite all this uncertainty, there *is* at least a consensus among the authorities as to the historical practice that the right of confrontation was designed to *counteract* — namely, trial by affidavit. This was recognized in the earliest Supreme Court decision interpreting the clause, *see Mattox*, 156 U.S. at 242, 15 S. Ct. at 339, and was affirmed in the Court's most recent case on the subject, *see Lilly v. Virginia*, 119 S. Ct. 1887, 1894 (1999) (plurality opinion). As stated in Justice Thomas's comprehensive review of the relevant historical sources:

> In 16th-century England, magistrates interrogated the prisoner, accomplices, and others prior to trial. These interrogations were "intended only for the information of the court. The prisoner had no right to be, and probably never was, present." 1 J. Stephen, A History of the Criminal Law of England 221 (1883). At the trial itself, "proof was usually given by reading depositions,

that the historical understanding of the clause furnishes no solid guide to adjudication.

A rule requiring production of available witnesses would significantly curtail development of the law of evidence to eliminate the necessity for production of declarants where production would be unduly inconvenient and of small utility to a defendant . . . . If the hearsay exception involved in a given case is such as to commend itself to reasonable men, production of the declarant is likely to be difficult, unavailing, or pointless.

*Dutton*, 400 U.S. at 95-96, 91 S. Ct. at 223 (Harlan, J., concurring in result) (citations omitted).

Thus, neither a "plain language" nor a "framers' intent" analysis points unambiguously toward a single set of core values that the Confrontation Clause is meant to advance. Moreover, any hope that the Supreme Court might have harmonized these textual and historical sources is quickly dashed. Consider, for example, the Court's statement in *Green* that the "literal right to 'confront' the witness at the time of trial . . . forms the core of the values furthered by the Confrontation Clause." *Green*, 399 U.S. at 157, 90 S. Ct. at 1934-35. The Court more recently affirmed this view, explaining that "[w]e have never doubted . . . that the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." *Coy v. Iowa*, 487 U.S. 1012, 1016, 108 S. Ct. 2798, 2801 (1988). *Coy*, therefore, invalidated a procedure in which a screen was erected at trial between the criminal defendant and two child witnesses who accused him of sexually assaulting them. The Court reasoned that "there is something deep in human nature that regards face-to-face confrontation between accused and accuser as essential to a fair trial in a criminal prosecution." 487 U.S. at 1017, 108 S. Ct. at 2801 (internal quotations and citations omitted).

Just two years later, however, the Court upheld the use of one-way closed circuit television to present the testimony of a child witness in a child sexual abuse case. *See Maryland v.*

156 U.S. 237, 242, 15 S. Ct. 337, 339 (1895); or that "[t]he central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact," so that "we cannot say that [face-to-face] confrontation is an indispensable element of the Sixth Amendment's guarantee of the right to confront one's accusers," *Maryland v. Craig*, 497 U.S. 836, 845, 849-50, 110 S. Ct. 3157, 3163, 3166 (1990). Notwithstanding these disparate visions of the Confrontation Clause, I believe that certain core principles can be discerned, and that these principles, viewed in light of the express terms of the Clause itself, uniformly support the admission of the videotaped testimony at issue in this case.

Of course, the first test for any proposed construction of the Confrontation Clause is whether it comports with the express language of this constitutional provision. Unfortunately, one quickly discovers that, while there is no consensus on the contours of the right of confrontation, there *is* widespread agreement that the Confrontation Clause means something more than what it literally says. The clearest example of this dichotomy between language and interpretation concerns hearsay evidence, a matter to which the clause itself does not directly speak. As observed in Justice Harlan's concurrence in *California v. Green*:

Simply as a matter of English the clause may be read to confer nothing more than a right to meet face to face all those who appear and give evidence at trial. Since, however, an extrajudicial declarant is no less a "witness," the clause is equally susceptible of being interpreted as a blanket prohibition on the use of any hearsay testimony.

*Green*, 399 U.S. at 175, 90 S. Ct. at 1944 (Harlan, J., concurring) (footnote omitted). Yet, Justice Harlan recognized that "[n]either of these polar readings is wholly satisfactory, still less compelling." 399 U.S. at 175, 90 S. Ct. at 1944 (Harlan, J., concurring). Justice Scalia's dissent in *Maryland v. Craig* likewise observes:

The Sixth Amendment does not literally contain a prohibition upon [hearsay] evidence, since it guarantees the defendant only the right to confront "the witnesses against him." As applied in the Sixth Amendment's context of a prosecution, the noun "witness" — in 1791 as today — could mean either (a) one "who knows or sees any thing; one personally present" or (b) "one who gives testimony" or who "testifies," *i.e.,* "in *judicial proceedings,* [one who] make[s] a solemn declaration under oath, for the purpose of establishing or making proof of some fact to a court." 2 N. Webster, An American Dictionary of the English Language (1828) (emphasis added). See also J. Buchanan, Linguae Britannicae Vera Pronunciatio (1757). The former meaning (one "who knows or sees") would cover hearsay evidence, but is excluded in the Sixth Amendment by the words following the noun: "witnesses *against him.*" The phrase obviously refers to those who give testimony against the defendant at trial. We have nonetheless found implicit in the Confrontation Clause some limitation upon hearsay evidence, since otherwise the government could subvert the confrontation right by putting on witnesses who know nothing except what an absent declarant said.

*Craig*, 497 U.S. at 864-65, 110 S. Ct. at 3173-74 (Scalia, J., dissenting); *cf. Craig*, 497 U.S. at 848, 110 S. Ct at 3165 ("[A] literal reading of the Confrontation Clause would abrogate virtually every hearsay exception, a result long rejected as unintended and too extreme." (internal quotations and citation omitted)).

Given this lingering doubt upon employing a "plain language" analysis, one naturally looks to the intent of the framers. Regrettably, the scholars and Supreme Court justices who have examined the historical record have conceded that "[t]here is virtually no evidence of what the drafters of the Confrontation Clause intended it to mean." *White v. Illinois*, 502 U.S. 346, 359, 112 S. Ct. 736, 744 (1992) (Thomas, J., concurring); *see also Green*, 399 U.S. 149, 176 n.8, 90 S. Ct.

1930, 1944 n.8 (1970) (Harlan, J., concurring) ("[M]y own research satisfies me that the prevailing view — that the usual primary sources and digests of the early debates contain no informative material on the confrontation right — is correct."); Richard D. Friedman, Confrontation: The Search for Basic Principles, 86 Geo. L.J. 1011, 1022 (1998) ("The origins of the Clause are famously obscure."). The problem is exacerbated by the lack of contemporaneous Supreme Court decisions; the Court first construed the clause in *Mattox*, over a hundred years after the Sixth Amendment was adopted.

This murky history is notably illustrated in the evolving views of Justice Harlan. In *Green*, upon surveying the "scant" evidence of the framers' intent and the Court's early decisions, Justice Harlan concluded that "*availability* underlies the confrontation right." *Green*, 399 U.S. at 179, 90 S. Ct. at 1946 (Harlan, J., concurring). Yet, in the Court's very next term, Justice Harlan adopted Wigmore's view that the Confrontation Clause was "intended to regulate trial procedure" by specifying "what mode of procedure shall be followed — *i.e.* a cross-examining procedure — in the case of such testimony as is required by the ordinary law of Evidence to be given infra-judicially." *Dutton v. Evans*, 400 U.S. 74, 94, 91 S. Ct. 210, 222 (1970) (Harlan, J., concurring in result) (quoting 5 J. Wigmore, Evidence § 1397, at 131 (3d ed. 1940)). Justice Harlan then stated:

Nor am I now content with the position I took in concurrence in California v. Green, *supra,* that the Confrontation Clause was designed to establish a preferential rule, requiring the prosecutor to avoid the use of hearsay where it is reasonably possible for him to do so — in other words, to produce available witnesses. Further consideration in the light of facts squarely presenting the issue, as *Green* did not, has led me to conclude that this is not a happy intent to be attributed to the Framers absent compelling linguistic or historical evidence pointing in that direction. It is common ground